AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

418 Hillside Avenue, Waverly, Ohio 45690

)
)
)
)
)
)

Case No.    2:24-mj-293

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956, 1957; 21 USC §§ 841, 846, 843(a)(5), 843(a)(6), 843(b) | Money laundering conspiracy; Engaging in monetary transactions in property derived from specified unlawful activity; Distribution and possession with intent to distribute of controlled substance; Drug trafficking conspiracy; etc. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

STACIE MODESITT SCHMIDT    Digitally signed by STACIE MODESITT SCHMIDT
Date: 2024.06.03 10:51:13 -04'00'

*Applicant's  signature*

Stacie Modesitt Schmidt, Special Agent, DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:    6/4/2024

*Judge's signature*

City and state:  Columbus, Ohio

Chelsey M. Vascura
United States Magistrate Judge

*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

**IN THE MATTER OF THE SEARCH OF:**

**418 Hillside Avenue, Waverly, Ohio 45690**

**and**

**203 Cherry Street, Waverly, Ohio 45690**

**Case No.**   2:24-mj-293

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Stacie Modesitt Schmidt, being duly sworn, hereby depose and state as follows:

### IDENTITY AND EXPERIENCE OF AFFIANT

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search premises known as 418 Hillside Avenue, Waverly, Ohio 45690 ("**TARGET LOCATION 1**") and 203 Cherry Street, Waverly, Ohio 45690 ("**TARGET LOCATION 2**") (referred to collectively as "**TARGET LOCATIONS**"), each further described in Attachments A, for the things described in Attachment B.

2.      I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been so employed since August 2008. I am currently assigned to the Tactical Diversion Squad (TDS) of the Columbus District Office within the Detroit Field Division. As such, I investigate violations of the United States Controlled Substances Act (CSA), codified in Title 21 of the United States Code, and the implementing Federal Regulations, Part 1300 et seq. During my career, I have been the lead investigator, or have participated, in investigations of entities for violations of the CSA and its implementing regulations. I have received specialized training from

the DEA, including a 19-week Basic Agent Training course at the DEA Academy in Stafford, Virginia from August – December 2008.

3.      During my tenure with DEA, I have participated in investigations involving complex criminal conspiracies and drug trafficking organizations. I have conducted investigations into the unlawful importation, possession, and distribution of controlled substances, related laundering of monetary instruments, as well as conspiracies to commit these offenses. By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and avoid detection by law enforcement. I have planned, participated in and supervised the execution of search warrants authorizing the search of drug traffickers, locations associated with drug traffickers and their co-conspirators, such as residences, businesses, storage facilities, outbuildings, safety deposit boxes, and vehicles. I know that drug trafficking is extremely profitable and requires large amounts of currency to operate surreptitiously. In this regard, I have obtained and executed numerous search warrants leading to seizures of ledgers, notebooks, papers, and other related record-keeping instruments in paper and electronic formats, many of which have been used to record voluminous drug and money laundering transactions. I have been required to analyze information resulting from traditional record sources, such as pen register and trap-and-trace devices, financial records, utility records, and telephone toll and subscriber records, as well as nontraditional record sources, such as the informal ledgers routinely maintained by drug traffickers listing amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources, commonly referred to as pay-owe sheets.

4.      By virtue of my training and experience, and through my conversations with and review

of reports from other experienced agents and officers who conduct drug investigations, I am

aware:

     a.      that drug traffickers often place assets in names other than their own and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

     b.      that even though these assets are in other persons' names drug traffickers continue to exercise dominion and control;

     c.      that drug traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

     d.      that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds. That the aforementioned books, records, receipts, notes, ledgers, etc, are maintained where the drug traffickers have ready access to them;

     e.      that it is common for drug traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in drug trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

     f.      that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers. These items are maintained by the drug traffickers within their residences and/or other locations which they maintain dominion and control;

     g.      that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

     h.      that to accomplish these goals, drug traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing services, real

estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i.      that drug traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

j.      that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

k.      that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

l.      that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m.      that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

n.      that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency:

o.      that drug traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

p.      that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency;

q.      that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in dangerous drugs; and

r.      that individuals involved in drug trafficking often require the use of cellular telephones to set up the times, places, and manner for collecting proceeds, and often use cellular telephones, tablets, and/or computers to conduct or facilitate their illicit drug operations.

5.      The facts set forth in this affidavit are based on my personal observations, training and experience, as well as information obtained from various law enforcement personnel and witnesses involved in this investigation. Specifically, I have obtained and reviewed oral and written reports about this and other investigations from DEA special agents and other law enforcement authorities. I have also obtained information from physical and electronic surveillance conducted by DEA special agents and other law enforcement authorities. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

## PURPOSE OF THE AFFIDAVIT

6.      This affidavit is made in support of an application for a warrant to search 418 Hillside Avenue, Waverly, Ohio 45690 (**TARGET LOCATION 1**) and 203 Cherry Street, Waverly, Ohio 45690 (**TARGET LOCATION 2**), each more particularly described in Attachments A, for the items listed in Attachment B, which constitute evidence of a crime, contraband, fruits of crime, or other items illegally possessed, and property designed for use, intended for use, or used in committing violations of 18 U.S.C. §§ 1956, 1957 (conspiracy to commit money laundering, and engaging in monetary transaction in property derived from specified unlawful activity), 21 U.S.C. § 841 (distribution of and possession with the intent to distribute controlled substances, including Schedule III Controlled Substances, Psilocybin Mushrooms, Marijuana, and Cocaine), 21 U.S.C. § 846 (conspiracy to distribute and to possess with the intent to distribute controlled substances, including Schedule III Controlled Substances, Psilocybin Mushrooms, Marijuana,

and Cocaine), 21 U.S.C. § 843(a)(5) (unlawful possession of tools used to make a counterfeit

substance), 21 U.S.C. § 843(a)(6) (unlawful possession of a tableting machine or product used to

manufacture a controlled substance), and 21 U.S.C. § 843(b) (use of communication facility to

facilitate the commission of a drug felony) (hereinafter the "**SUBJECT OFFENSES"**).

7.      I am requesting authority to search the entire **TARGET LOCATIONS**, including the

residential dwelling, curtilage, all outbuildings, vehicles located on the premises that are owned

or operated by the residents of the **TARGET LOCATIONS** and more specifically described

herein, the person of any resident present, and any electronic devices located therein where the

items specified in Attachment B may be found, and to seize all items listed in Attachment B as

instrumentalities, fruits, and evidence of crime.

## PROBABLE CAUSE

8.      Since October 2020, the United States Postal Inspection Service ("USPIS") has been

investigating the mailing of illegal steroids from Waverly, Ohio to the area of Phoenix, Arizona.

Using a confidential informant ("CI"), USPIS made 4 controlled purchases through an online

vendor called "Pure Powders." Pure Powders is a sponsor on an online Health and Wellness

forum called "Brotherhood of Pain." After each controlled purchase order was made through the

Pure Powders website, the CI was directed to send money to a recipient in China via Western

Union and/or Money Gram. The product was then shipped from Waverly to the CI's address in

Arizona.

9.      Details for the 4 CI buys are as follows:

a.      October 21, 2020 – Postal Inspector provided $500 Official Advanced Funds
("OAF") to the CI for the purchase of approximately 50 grams of Testosterone Enanthate
90, Testosterone Cypionate 90, Nandrolone Deconate 150, and Sildenafil Citrate 80. The
CI sent $460 through Western Union to "Wanghong Liu" located in China. On October
27, 2020, a parcel was mailed to the address provided by the CI from Thomas Shelby,
**TARGET LOCATION 1**, and paid for using a Visa ending in 1911. On November 2,

2020, investigators retrieved and opened the package. The parcel contained 4 Ziploc baggies containing powder and labeled Testosterone Enanthate 90, Testosterone Cypionate 90, Nandrolone Deconate 150, and Sildenafil Citrate 80. Per the policy of the Arizona Department of Public Safety, one sample at a time is tested. Once the lab results are positive for a dangerous drug, further analysis of other samples is prohibited. Lab results on this package resulted in a positive result for Testosterone enanthate, a Schedule III Controlled Substance.

b.      November 12, 2020 – Postal Inspector provided $500 OAF to the CI for the purchase of approximately 50 grams of Testosterone Enanthate 90, Testosterone Cypionate 90, Nandrolone Deconate 150, and Sildenafil Citrate 80. The CI sent $460 through Western Union to "Zhongyan Liu" located in China. On November 13, 2020, a parcel was mailed to the address provided by the CI from Thomas Shelby, **TARGET LOCATION 1**, and paid for using a MasterCard ending in 4249. On November 17, 2020, investigators retrieved and opened the package. The parcel contained 3 Ziploc baggies containing powder and labeled Testosterone Cypionate 90, Nandrolone Deconate 150, and Sildenafil Citrate 80. The Testosterone Enanthate 90 was missing from the order. On November 18, 2020, another package was mailed to the address provided by the CI from Thomas Shelby, **TARGET LOCATION 1**. This package contained the Testosterone Enanthate 90. Lab results on this package resulted in a positive result for Testosterone enanthate, a Schedule III Controlled Substance.

c.      January 15, 2021 – Postal Inspector provided $500 OAF to the CI for the purchase of approximately 50 grams of Testosterone Enanthate 90, Testosterone Cypionate 90, Nandrolone Deconate 150, and Sildenafil Citrate 80. The CI sent $460 through Western Union to "Zhongyan Liu" located in China. On January 20, 2021, the CI was contacted by Pure Powders via email to inform the CI that the warehouse was out of Nandrolone Deconate and they wanted to substitute Nandrolone Phenylpropionate (NPP) in its place. Investigators agreed to the change, and the CI responded to the e-mail accordingly. On January 21, 2021, a parcel was mailed to the address provided by the CI from Thomas Shelby, **TARGET LOCATION 1**, and paid for using a Visa ending in 0310. On January 26, 2021, investigators retrieved and opened the package. The parcel contained 4 Ziploc baggies containing powder and labeled Testosterone Enanthate 90, Testosterone Cypionate 90, Nandrolone Phenylpropionate (NPP), and Sildenafil Citrate 80. Lab results on this package resulted in a positive result for Testosterone cypionate, a Schedule III Controlled Substance.

d.      February 5, 2021 – Postal Inspector provided $500 OAF to the CI for the purchase of approximately 50 grams of Testosterone Propionate, 10 grams of Drostanalone Propionate, 50 grams of Oxandrolone, and 50 grams of Stanazolot. The CI sent $680 through Western Union to "Lanean Li" located in China. On February 9, 2021, the CI was contacted by Pure Powders via email to inform the CI that the order had been processed. That same day, a parcel was mailed to the address provided by the CI from Thomas Shelby, **TARGET LOCATION 1**, and paid for using a Visa ending in 0310. On February 12, 2021, investigators retrieved and opened the package. The parcel contained 4 Ziploc baggies containing powder and labeled Winstrol (Stanazolot), Anadrol

(Oxandrolone), Mast P (Drostanalone Propionate), and Test P (Testosterone Propionate). Lab results on this package resulted in a positive result for Oxymetholone, a Schedule III Controlled Substance.

10.     For the 4 CI buys described above, the return address listed on the Priority Mail parcel shipments of product was "Thomas Shelby," **TARGET LOCATION 1**. According to the Pike County Recorder and Auditor Offices, Mark Anglemyer (hereafter referred to as "Anglemyer") and ███████████ purchased this residence in 2016. Your affiant knows this to be the residential address of Anglemyer and ███████████. According to law enforcement indices, there is no one by the name of Thomas Shelby associated with **TARGET LOCATION 1**.

11.     The credit cards used to pay for the shipping of the packages for the 4 CI buys (Visa 1911, Mastercard 4249, and Visa 0310) have all been identified as being connected to a US Bank account belonging to Tanner Morris. Through surveillance and investigation, Morris has been identified as a member of the Anglemyer drug trafficking organization (DTO).

12.     In connection with the January 15, 2021 buy, USPIS investigators provided a photograph taken on January 21, 2021 of a white male at the counter inside the Post Office located at 125 E. Second Street in Waverly, from which the parcel was shipped. The subject in the photograph, identified as Tanner Morris, had multiple United States Postal Service ("USPS") packages stacked in front of him. Based on information provided by USPIS, there were 10 packages mailed that day by Morris, and all had the return address of Thomas Shelby, **TARGET LOCATION 1**. All 10 were paid for by Morris with his credit card, the Visa ending in 0310.

13.     On February 26, 2021, USPIS learned of a suspicious Priority Mail package being mailed from Thomas Shelby, **TARGET LOCATION 1,** to ███████████████████████, ███████████████. The package was shipped on February 22, 2021 from the Post Office

located at 125 E. Second Street in Waverly. Shipping was paid for using the aforementioned
Visa credit card ending in 0310.

14.     Pursuant to a federal search warrant, USPIS opened the parcel addressed to ████

████ and found it contained 10 white plastic bottles with a hand-written label reading "Oxy,"

containing approximately 221 grams of yellowish pills, and 10 white plastic bottles with a Pure

Powders Direct label reading "Dianabol," containing approximately 217 grams of blue and pink

pills. The pills were unmarked and appeared to have been pressed, consistent with the use of pill

press. Lab results revealed that the pills in the bottle labeled "Dianabol" were positive for

methandrostenolone (metandienone), a dangerous drug not sold legally in the United States, and

the pills in the bottle labeled "Oxy" were positive for oxymetholone. Both are androgen and

anabolic steroids, schedule III controlled substances.

15.     USPIS records identified 2 other shipments sent to ████████████████████

on March 9 and March 22, 2021, respectively. No name was listed on the return address label,

but the return address used was PO Box 186, Waverly, Ohio 45690. According to the

Application for Post Office Box Service, PO Box 186 belongs to Anglemyer with an associated

address of 617 S. Market Street, Apt. 20, Waverly, Ohio 45690 (hereafter referred to as "**the**

**Market St. Apartment"**). The 2 shipments were paid for using the aforementioned Visa credit

card ending in 0310.

16.     In April 2021, DEA received information that Anglemyer ordered a TDP 1.5 Desktop

Tablet Press from LFA Machine DFW, LLC (hereafter "LFA") on March 24, 2021. On the same

day, Anglemyer also ordered from LFA 2 kilograms of Firmapress White, a binding powder used

for making tablets. Records indicate the press was delivered on March 30, 2021 to **TARGET**

**LOCATION 1**. The delivery was signed for in the name of "Anglemyer."  The purchase was made with a Mastercard ending in 4960 that is tied to Anglemyer's Fifth Third Bank account.

17.     The shipment was flagged by DEA as suspicious because **TARGET LOCATION 1 is a** residence and not a business address. The TDP 1.5 Desktop Tablet Press is capable of producing 5,000 tablets per hour. Through training and experience, I know that narcotics distributors often use pill presses in the production of counterfeit pharmaceuticals.

18.     Records from LFA revealed that during the purchase, Anglemyer was required to submit a Due Diligence Form. On the form, Anglemyer claimed to be the owner of a company called "SPC Services LLC" with an address of **TARGET LOCATION 1**. The Due Diligence Form required that Anglemyer state his intended use for the press. Anglemyer stated that the type of materials that would be running through the press included "vitamin c, vitamin b, vitamin d, vitamin e, creatine, beta, alanine, zinc, fenugreek, dextrose, etc." The bottom of the form read, "At LFA we take prevention of crime seriously. By signing this form, you are confirming that you are not using any products purchased to commit a crime." The form was Docu-Signed by "Mark A. Anglemyer, Jr."  Anglemyer provided LFA with a scanned copy of a temporary Ohio Driver's License/Identification card as identification when he submitted the form online. The address on the card was **the Market St. Apartment**. Investigators know this address to be an apartment that Anglemyer has utilized to process and package steroid products.

19.     Pursuant to the Ohio Secretary of State's website, SPC Services LLC is not a Limited Liability Corporation in the State of Ohio. Other research databases were searched, and investigators could only find one listing for an SPC Services LLC: a termite exterminator service located in Miami, Florida.

20.     Records received from Customs and Border Patrol (CBP) indicated Anglemyer received 107 import shipments at **TARGET LOCATION 1** between August 2016 and February 2021. Anglemyer received 15 import shipments at the Market St. Apartment between March 2017 and November 2021. While a few shipments were from recognizable businesses, many import shipments were from undisclosed locations in China or other Chinese entities. Moreover, many of the cargo descriptions and weights for the shipments were inconsistent. For example, one shipment listed the cargo description as an engraving pen weighing 3 kilograms, another shipment listed the cargo description as an aluminum bottle weighing 7 pounds, and another shipment listed the cargo description as a plastic bottle cap weighing 4 pounds. Based on my training and experience, I know that China is a source country for illegally obtained controlled substances and pre-cursor chemicals used to make illegal pharmaceuticals and that Chinese companies selling these items often attempt to conceal the true contents of packages by listing the contents as mundane, everyday items.

21.     Records from CBP further revealed that on April 4, 2021, a package addressed to Anglemyer at the **Market St. Apartment** was interdicted coming from China. The contents of the package were listed as a "remote control"; however, CBP found the package to contain 2.23 kilograms of Testosterone Enanthate, an androgen and anabolic steroid that is a schedule III controlled substance.

22.     On July 7, 2021 surveillance was established at **TARGET LOCATION 1**. A black Dodge Ram truck, OH# HJF6480, registered to Anglemyer, was parked on the street in front of the residence. A black Hyundai Accent, OH# HLZ9263, registered to ███████████, was parked in the driveway.

23.     During surveillance, Heather Howell, a co-conspirator, exited **TARGET LOCATION 1**, entered the Hyundai Accent and departed. Howell later arrived at the **Market St. Apartment.**

24.     A few hours later on that same day, Anglemyer exited **TARGET LOCATION 1**, entered his Ram truck, and drove to the **Market St. Apartment** where Howell met him outside. They both entered the apartment. Shortly thereafter, Anglemyer and Howell exited the apartment, got into Anglemyer's Ram truck, and departed.

25.     Surveillance also observed a 2020 Kawasaki motorcycle, bearing Ohio license plate HBG98, parked in front of **TARGET LOCATION 1**. The motorcycle was registered to Tanner Morris at 201 Cherry Street, Waverly Ohio. Within 30 minutes of Anglemyer and Howell's return to **TARGET LOCATION 1**, Morris exited **TARGET LOCATION 1**, got on his motorcycle, and departed the premises.

26.     Surveillance was maintained at **TARGET LOCATION 1** when Anglemyer was observed exiting his residence at approximately 3:06 PM. Anglemyer climbed into the Ram truck and after approximately 15 minutes, drove to the **Market St. Apartment**.

27.     On September 9, 2021 surveillance observed Anglemyer's Ram truck was parked on the street at **TARGET LOCATION 1**. Investigators observed Anglemyer exit his residence and drive his truck to the **Market St. Apartment**. The black Hyundai Accent was parked outside the **Market St. Apartment**.

28.     Surveillance was maintained in the area of the **Market St. Apartment**. Anglemyer's Ram truck traveled to the Post Office located at 125 E. Second Street. Howell waited in the passenger seat while Anglemyer entered the post office. Anglemyer exited the post office and returned to his truck, and then he and Howell returned to the **Market St. Apartment**.

~~29.~~    According to USPS records, Anglemyer mailed out 5 packages, paying for shipping with one of his own credit cards. There was no name associated with the return address, and the return address listed for all of the packages was PO Box 186, Waverly, Ohio. The recipients' names were also blank.

30.    On November 9, 2021 surveillance was established in the area of the **Market St. Apartment**. Both Anglemyer's Ram truck and a blue Chevrolet Equinox were parked in front. Anglemyer purchased the Equinox in May of 2021; it is registered to him at the **Market St. Apartment**. The Equinox is usually driven by Howell, who lives at the **Market St. Apartment**.

31.    At approximately 11:38 AM, Anglemyer's Ram truck exited the parking lot of the **Market St. Apartment**, with Anglemyer and Howell in the truck. Surveillance followed Anglemyer to the Post Office located at 114 S. Forsythe Street, Piketon, Ohio. Howell exited the truck and entered the post office with a package. When Howell exited the post office a minute later, she was in possession of what appeared to be a receipt.

32.    According to USPS records, a package was mailed from the Piketon post office using the return address of PO Box 186, Waverly, Ohio. The package was shipped to ██████████, ████████████████████. The package weighed 2 lbs. 3 oz. and was paid for with cash. USPIS records revealed 65 other shipments were made from Waverly, Ohio to ██████████, ████████████████ between October 18, 2019 and December 4, 2023. Thirteen of the parcels weighed between 2 lbs. and 4 lbs. 5 oz. The names used on the return labels included SPC Services LLC, Tanner Morris, and Thomas Shelby. The return addresses included 201 and 701 Cherry Street, **TARGET LOCATION 1**, and PO Box 186. Many of the shipments were paid for using cards that have been used before by members of the Anglemyer DTO to pay to ship steroids or purchase the pill press.

33.      In the afternoon of November 9, 2021, Anglemyer and Howell exited the **Market St. Apartment** and entered the Ram truck. The vehicle was followed to the lumberyard located off Market Street. Howell exited the truck and opened the driver's side door of a green Chevrolet Lumina, OH# JER3905, registered to ███████████████████████, ████ Howell dropped something off or retrieved something from the Lumina. Howell then got back into the truck and Anglemyer drove away. Approximately one hour later, an unknown white female, came from the lumber yard building and entered the Lumina. The female sat in the driver's seat to smoke a cigarette before reaching under the seat and returning to the business. Agents did not observe if the unknown female carried anything with her as she returned inside.

34.      Based on my training and experience, this activity was consistent with a drug transaction. I know that often times drug traffickers pre-arrange a "drop" for a customer at a location where only the customer will find it, such as the customer's vehicle. I also know, based on my training and experience, that payments for drugs are not always made hand-to-hand, but rather through virtual platforms such as Venmo or Paypal, which are often readily available on a cellular telephone, especially in instances such as these where the individuals do not meet face to face.

35.      Surveillance was maintained on Anglemyer's Ram truck and the vehicle was followed to the Post Office located at 125 E. Second Street. Howell exited the passenger side of the truck with a cardboard box and entered the post office. Approximately 5 minutes later, Howell exited empty handed and got back into the truck.

36.      According to USPS records, a package was mailed from the Waverly Post Office using the return address of PO Box 186, Waverly, Ohio. The package was shipped to ███████████ ████████████████████. The parcel weighed 4 pounds and was paid for with cash.

37.    There were 46 other shipments sent from the Anglemyer DTO to ████████ address between October 8, 2019 and January 2, 2024. The names used on the return labels included Tanner Morris (a former DTO member), ███████████████████████), and Thomas Shelby[1], or were otherwise left blank. The return addresses included 201 Cherry Street (which has been identified as the previous residence of Tanner Morris), **TARGET LOCATION 1**, PO Box 186, 516 W. A Street, Wellston, Ohio (a previous address of Blake Mankin, who is a known member of the Anglemyer DTO), or were otherwise left blank. Nineteen packages weighed between 2 lbs. and 4 lbs. 7 oz. All of the shipments were paid for using several credit cards belonging to members of the Anglemyer DTO or cash. At least 5 of the cards have been identified as being used to ship steroids or purchase the pill press.

38.    Through my training and experience and my knowledge of the investigation, I know that the Anglemyer DTO sends packages via Priority Mail through the USPS. I am aware that the USPS mail system is frequently used to transport controlled substances and/or proceeds from the sale of controlled substances throughout the United States. Although Priority Mail was designed as a less expensive way to fit the needs of businesses shipping time-sensitive materials, I know that drug traffickers prefer services such as Priority Mail because of their reliability and the ability to track the parcel's progress to the intended delivery point.

39.    Based on my training, experience, and information relayed to me by other investigators who specialize in investigations relating to controlled substances, I am aware that legitimate business mailings often (a) contain typewritten labels; (b) are addressed to and/or from a business; and (c) use corporate charge accounts to avoid time-consuming cash payments. Priority

---

[1] Through investigation, I know Thomas Shelby to be an alias that Morris uses.

Mail parcels containing controlled substances being shipped by drug traffickers usually display one or more of the following: (a) a label with handwritten address information; (b) a label addressed from one individual to another individual; (c) a label that does not contain a business account number, thereby indicating the sender paid with cash or credit; and/or (d) a parcel that is heavier than the typical mailing, often weighing more than 2 pounds for Priority Mail.

40.     Based on my training and experience, I know that it is common for drug traffickers to use names not associated with an address and/or fictitious names and addresses to evade detection by law enforcement and to appear legitimate and conceal the true sender. Thomas Shelby, Alex Gray[2], and SPC Services, LLC are some of the fictitious names used by the Anglemyer DTO.

41.     On November 17, 2021, at approximately 9:15 AM, surveillance was established at **TARGET LOCATION 1**, as well as the **Market St. Apartment**. Anglemyer's Ram truck was parked in the front yard of **TARGET LOCATION 1** and the Equinox was at the **Market St. Apartment.** Within 30 minutes, the Ram truck had moved and was located at the **Market St. Apartment**. At approximately 11:27 AM, the Ram truck, occupied by Anglemyer and Howell, departed the parking lot of the **Market St. Apartment** and arrived at the Post Office located at 125 E. Second Street. Anglemyer and Howell exited the truck. Each were in possession of 3-4 boxes which they carried into the post office. At approximately 11:33 AM, both exited the post office. Howell walked back to the truck carrying multiple flattened USPS boxes and envelopes used for shipping packages/parcels. Both re-entered the truck and departed the area, eventually returning to the **Market St. Apartment**.

---

[2] Through investigation, I know Alex Gray to be an alias Mark Anglemyer uses.

42.     Records from USPIS disclosed that at 11:29 AM, 7 Priority Mail parcels were shipped out with the return address of PO Box 186, Waverly, Ohio and were paid for with a credit card belonging to Anglemyer.

43.     On November 19, 2021 surveillance was initiated at **TARGET LOCATION 1**. Anglemyer's Ram truck was parked across the street. At approximately 11:30 AM, Anglemyer exited the residence, crossed the street, and entered the Ram truck. Jamie Anglemyer[3] exited the house carrying a large box. Anglemyer had moved the truck so the passenger side of the vehicle was facing the residence. Jamie Anglemyer placed the large box in the truck via the passenger side before returning to the house. Anglemyer left **TARGET LOCATION 1** and arrived at the **Market St. Apartment**.

44.     At approximately 12:42 PM, Anglemyer drove the Ram truck with Howell in the passenger seat as it arrived at the Post Office at 125 E. Second Street. Anglemyer exited the truck with at least 3 boxes that he carried into the post office. Howell remained in the truck. Within 5 minutes, Anglemyer exited the post office with no boxes, and appeared to be carrying a receipt. Anglemyer re-entered the truck and departed.

45.     USPIS records disclosed that at 12:43 PM, 5 parcels were shipped out using the return address of PO Box 186, Waverly, Ohio and paid for with a credit card belonging to Anglemyer. One of the 5 parcels was shipped to ██████████████████████.

46.     Surveillance followed Anglemyer's Ram truck southbound on Route 23. At approximately 12:53 PM, Anglemyer backed the truck into the driveway of a residence located at ██████████████████. Anglemyer remained in the truck and appeared to be conversing

---

[3] In this affidavit, ████████████ will be referred to by her first name, ████ and Mark Anglemyer will continue to be referred to by his last name, Anglemyer.

with an unidentified white male who was standing between the truck and the mailbox. After approximately 5 minutes Anglemyer pulled away from the residence.

47.    Anglemyer's truck was subsequently followed to the Waverly Field parking lot located at 500 E. Second Street in Waverly. At approximately 1:11 PM, Anglemyer pulled up next to a gray Ford truck, bearing OH #JLD6625, that was registered to ████████████████████, ████████████    The 2 trucks were parked driver's window to driver's window. Anglemyer reached out the window and handed a small plastic baggie to the unknown driver of the gray Ford truck. Both vehicles departed, and surveillance followed Anglemyer and Howell back to the **Market St. Apartment.** At approximately 2:07 PM, Anglemyer was observed in the Dodge Ram departing the parking lot of the **Market St. Apartment**, and subsequently arriving at **TARGET LOCATION 1**.

48.    Based on my training and experience, the 2 short trips after departing the Post Office were consistent with drug deliveries. The first stop, at the driveway of a residence only lasted a short period of time before Anglemyer and Howell departed. I know that when drug traffickers are delivering product, the encounters are generally quick. During the second stop at Waverly Field, surveillance agents observed a hand-to-hand exchange between Anglemyer and the driver of the other truck.

49.    On March 21, 2022, surveillance was established at the **Market St. Apartment**. Anglemyer's Dodge Ram was parked in front and Howell arrived in the Equinox at approximately 8:48 AM.

50.    At approximately 11:52 AM, Howell exited the apartment carrying a USPS box. Howell climbed into the Equinox and departed the complex. Surveillance followed Howell to the Post Office at 125 E. Second Street. Howell parked the vehicle and carried the package inside. A

short time later, Howell exited the post office with a receipt in hand. Howell then returned to the **Market St. Apartment** and entered the apartment using a key.

51.     Information was obtained from USPIS regarding the package dropped off at the Post Office by Howell. The package was sent Priority Mail Express and weighed almost 2 pounds. Howell paid for the shipping with cash. The return address was H. Burkitt, PO Box 186, Waverly, Ohio 45690. Agents identified Heather Burkitt as an alias for Howell from Facebook.

52.     On March 24, 2022, Anglemyer's Ram truck was parked in the driveway at **TARGET LOCATION 1**. Anglemyer exited his residence, entered the Ram truck, and drove to the **Market St. Apartment**. At approximately 12:00 PM, Anglemyer exited the **Market St. Apartment** carrying a black plastic bag in his hand and he placed it in the truck. Anglemyer then drove back to **TARGET LOCATION 1** and parked. Anglemyer remained in the truck for approximately 5 minutes and then entered the residence.

53.     At approximately 1:00 PM, a red Ford truck, bearing Ohio license plate number 479 YXZ, arrived at **TARGET LOCATION 1**. A white male exited the truck and walked over to the passenger door of Anglemyer's Ram truck. The white male got into the passenger side front door of the Ram truck and retrieved the black plastic bag that Anglemyer had been observed carrying as he departed the **Market St. Apartment**. The white male then, in possession of the black plastic bag, returned to his own truck and departed **TARGET LOCATION 1**.

54.     Based on my training and experience, this activity was consistent with an illegal drug purchase. Similar to the previous "drop" delivery at the lumber yard, the product was left for the customer at an agreed upon location, i.e., inside Anglemyer's truck. The customer arrived at **TARGET LOCATION 1** and retrieved the product from the truck without contacting Anglemyer, even though Anglemyer was home.

55.     On March 29, 2022, surveillance was established at the **Market St. Apartment**. Investigators found Anglemyer's Ram truck parked outside the apartment. At approximately 10:24 AM, a black Nissan Rogue registered to Arin K. Sodaro at 203 Cherry St., Waverly, Ohio (**TARGET LOCATION 2**) arrived at the **Market St. Apartment**. A white female, later identified as Arin Sodaro, a member of the Anglemyer DTO, exited the vehicle and went into the apartment. Approximately 30 minutes later, the apartment door opened and surveillance observed Sodaro and Anglemyer in the doorway. Sodaro then returned to the Rogue and departed south on Highway 23.

56.      At approximately 1:12 PM, Anglemyer exited the **Market St. Apartment** carrying a large Priority Mail box that he placed in the Ram truck. Anglemyer drove directly to **TARGET LOCATION 1** and went inside the house. The large Priority Mail box remained in the Ram truck. Approximately 5 minutes later, Anglemyer was observed exiting **TARGET LOCATION 1** with a backpack which he placed in the Ram truck.

57.     Surveillance followed Anglemyer from **TARGET LOCATION 1** to ███████ ██████, ██████████████████ where Anglemyer picked up a white male carrying a red backpack at approximately 1:24 PM. This white male was later identified as ████████████████ ███████████ got into the passenger seat of the Ram truck and Anglemyer departed.

58.     Records received as a result of a search warrant executed on Anglemyer's Facebook account revealed conversations indicating ████████████ was a member of the Anglemyer DTO. The conversations revealed that ██████████ held cocaine for Anglemyer because Anglemyer stated he could not trust himself around it. Anglemyer instructed ██████████ how to re-rock cocaine for distribution. ██████████ was involved in the sale of narcotics (cocaine, marijuana, and mushrooms) for Anglemyer. ██████████ kept a ledger detailing inventory and money owed

to Anglemyer. ███████ laundered money for Anglemyer by exchanging smaller bills for 100s through ███████ s mother's back account.

59.    Surveillance followed Anglemyer and ███████ to the Post Office located at 125 E. Second Street. At approximately 1:26 PM, Anglemyer exited the vehicle with the large Priority Mail box and entered the post office. A couple minutes later, Anglemyer exited the post office and walked back to the Ram truck.

60.    Investigators contacted USPIS regarding the Priority Mail box that had been taken to the Waverly Post Office by Anglemyer. USPIS personnel from Columbus, Ohio then interdicted/took possession of the package. USPIS advised that the Priority Mail box was addressed to ███████," with a return address of "Alex Gray, 617 S Market St, Apt 20, Waverly, OH 45690," the **Market St. Apartment**. There is no one by the name of Alex Gray associated with the **Market St. Apartment**. Shipping was paid for with a Mastercard ending in 8113 and was identified as being connected to Howell's Peoples Bank account.

61.    USPIS secured and executed a federal search warrant on the aforementioned package addressed to ███████. Inventory of the evidence seized from the package revealed the following:

- 1 white pill bottle with hand written markings "T3 40 MCJ"; containing 32 light blue-green tablets (pills). The pills were consistent with those created using a pill press. Final lab results yielded no controlled substances.

- 3 white pill bottles with label that reads "AROMASIN 25 MG" and "SPC LABS"; each bottle containing 30 light grey tablets (pills) - Total of 90 tablets (pills). Final lab results were positive for methandienone, a Schedule III controlled substance, and exemestane which is not controlled but can function as an estrogen blocker.

- 3 white pill bottles with label that reads "DIANABOL 50MG" and "SPC LABS"; each bottle containing 30 pink tablets (pills) - Total of 90 tablets (pills). The label refers

to an anabolic steroid, a schedule III controlled substance and final lab results were positive for methandienone, a Schedule III controlled substance.

- 3 plastic clear bottles, with red caps, that reads "VAR 20 MG" (handwriting); each containing clear liquid. Final lab results yielded no controlled substances.

- 3 glass vials with label that reads "TRENBOLONE ACETATE" and "SPC LABS", 100 mg/mL each; containing yellow liquid - Total of 300 mg/mL. Final lab results were positive for Trenbolone Acetate, an androgen and anabolic steroid. It is a schedule III controlled substance.

- 2 glass vials with label that reads "TESTOSTERONE ENANTHATE" and "SPC LABS", 250 mg/mL each; containing clear liquid - Total of 500 mg/mL. The label refers to an androgen and anabolic steroid, a schedule III controlled substance. Final lab results were positive for testosterone enanthate.

- 2 glass vials with black caps, no markings, each containing a white powder substance. Final lab results yielded no controlled substances.

- Ten glass vials with red caps, no markings, each containing a white powder substance. Final lab results yielded no controlled substances.

62.    USPIS records indicated that there were 5 other shipments sent to ████████ i between May 12, 2021 and March 1, 2024. The name used on the return labels was Alex Gray or otherwise left blank. The return addresses included the **Market St. Apartment** and PO Box 186. All of the shipments were paid for using 2 different credit/debit cards or cash. One of the cards is connected to Howell's Peoples Bank account, and the other card is connected to Morris's US Bank account. Both Morris and Howell have shipped out packages containing steroids using these credit cards. Sodaro was observed taking the last package to the post office to mail out.

63.    On May 10, 2022 investigators established surveillance on Morris at 7311 Skyline Drive E, #307, Columbus, Ohio 43235. Surveillance agents observed Morris exit the apartment and walk to the garage. Morris then backed out a lime green colored Ford Mustang bearing Ohio license plate number "Britt50."

64.     During the course of the surveillance, investigators followed Morris to the United States Post Office located at 6316 Nicholas Drive, Columbus, Ohio 43235. Morris exited the Ford Mustang and took a small Priority Mail package into the Post Office. Morris exited empty handed and returned to his apartment.

65.     Information received from USPIS revealed the US Priority Mail package shipped by Morris was addressed to ███████████████████████████████. The return address was Thomas Shelby, 201 Cherry Street, Waverly, Ohio 45690; this address has been identified from bank records and vehicle registrations as Morris' previous address where he lived in Waverly, before moving to Columbus, Ohio in October 2021. There is no Thomas Shelby associated with this residence.

66.     The package was subsequently seized and a federal search warrant was obtained for it. The package addressed to ██████████████████████, contained 16 glass vials of suspected steroids. Final analysis from the Columbus Division of Police Laboratory revealed the following:

- One glass vial containing liquid. Results were positive for an anabolic steroid, however, a complete analysis was not performed.

- 8 glass vials containing liquid. Lab results were positive for Testosterone enanthate, an androgen and anabolic steroid used in the treatment of low testosterone levels in men. It is a schedule III controlled substance.

- 2 glass vials containing liquid. Lab results were positive for Boldernone undecylenate, an androgen and anabolic steroid. It is a schedule III controlled substance.

- 5 glass vials containing liquid. A complete analysis was not performed.

67.     The USPIS report revealed that 26 packages had been mailed to 4450 S. Ridge Rd., Apt. 1207, McKinney, TX 75070 from the Post Office in Waverly, Ohio 45690 between January 2, 2021 and October 11, 2021. The packages were from Thomas Shelby, T Shelby, or left blank.

The return addresses used were **TARGET LOCATION 1**, PO Box 186, or left blank. Dax Serrano is named as the recipient on 21 of the 26 packages sent to ██████████████████████,

███████████████████

68.      On June 28, 2022, Waverly police initiated a traffic stop on a vehicle for improper tags. During a search of the vehicle, officers found a clear bag containing a white, powdery substance. The driver advised the substance was cocaine.[4] The driver also stated that he bought the cocaine from Arin Sodaro and that Sodaro told him she sells cocaine for Anglemyer.

69.      On July 20, 2022, surveillance was established at **TARGET LOCATION 1** where surveillance observed Anglemyer's Ram truck parked in front. At approximately 7:38 AM, the Rogue arrived and parked in the driveway. Sodaro exited the vehicle, obtained a key from above the door, and let herself in the residence.

70.      At approximately 1:52 PM, Sodaro exited **TARGET LOCATION 1** and climbed into the Ram truck. Sodaro drove to Chillicothe, Ohio. Sodaro put gas in the truck, made a purchase at Family Dollar, and washed the truck before returning to **TARGET LOCATION 1**.

71.      On July 27, 2022, surveillance was established in Waverly, Ohio. The Equinox was parked at the **Market St. Apartment**.  At approximately 9:47 AM, Sodaro's Rogue was observed parked in front of **TARGET LOCATION 1**. At approximately 11:18 AM, Anglemyer arrived at **TARGET LOCATION 1** and parked the Ram truck in the driveway.

72.      At approximately 1:12 PM, a white Nissan Altima parked in front of **TARGET LOCATION 1**. The vehicle was registered to ████████████████████████. A male, later identified as ████████, exited the vehicle and retrieved a large and heavy duffel

---

[4] Lab reports on the substance are still pending due to the covert nature of this investigation and the fact that Anglemyer is believed to have connections with Waverly police.



bag from the vehicle. ███████ carried the bag to the door and was let inside. A few minutes later, ███████ exited the residence with the visibly lighter duffle bag, returned to the Nissan Altima, and departed. Law enforcement provided information regarding ████ ████ is the owner of ████████████████ ████████████████████████.

73.    At approximately 1:24 PM, Sodaro exited **TARGET LOCATION 1**, climbed into the Rogue, and departed. Sodaro was not carrying anything. At approximately 1:54 PM, Howell exited the **Market St. Apartment**. Howell carried 3 parcels – one large box, a medium box, and a regular envelope. Howell departed in the Equinox and drove to the Post Office located at 125 E. Second Street. Howell entered the Post Office with the packages. At approximately 2:08 PM, Howell exited with Sodaro. Agents had not observed Sodaro arrive or enter the Post Office. Howell and Sodaro chatted on the sidewalk in front of the Post Office before each returned to their own vehicles. Howell returned to the **Market St. Apartment**, while Sodaro returned to **TARGET LOCATION 1**.

74.    Information received from USPIS revealed that the 2 boxes dropped off at the post office by were sent Priority Mail Express and the shipping costs were paid with cash. The return address on both boxes was P.O. Box 186 Waverly, OH 45690. The medium box was addressed to ████████████████████████. The larger box was addressed to 1█████ ████████████████████████.

75.    USPIS obtained a federal search warrant for the larger box shipped, which was addressed to ████████████████████████. As a result of the search warrant, investigators seized 7 white pill bottles labeled as miscellaneous steroids and 14 clear glass vials labeled as miscellaneous steroids. Final analysis from the Columbus Division of Police Laboratory revealed the following:

- At least 1 bottle of 30 pills labeled Clomid 50 mg.

- At least 1 bottle of pills labeled Arimidex 1 mg.

- At least 1 bottle of pills labeled Nolvadex 20 mg.

- 1 vial of liquid labeled Trenbolone Acetate 100 mg/mL, which tested positive for Trenbolone acetate, a schedule III controlled substance.

- 2 glass vials containing liquid, which tested positive for Boldenone undecylenate, an androgen and anabolic steroid, a schedule III controlled substance.

- 2 glass vials containing liquid, which tested positive for Testosterone enanthate, an androgen and anabolic steroid, a schedule III controlled substance.

- 2 glass vials containing liquid, which tested positive for Testosterone decanoate, an androgen and anabolic steroid, a schedule III controlled substance.

- 2 glass vials containing liquid, which tested positive for Testosterone phenylpropionate, an androgen and anabolic steroid, a schedule III controlled substance.

- 2 glass vials containing liquid, which tested positive for an anabolic steroid, a schedule III controlled substance in the United States.

- 3 glass vials containing compressed white powder substance – no controlled substance was detected.

76.    USPIS records revealed 4 other shipments made to ████████████████

████████████████ between March 23 and July 13, 2022. No name was listed on the return address label, but the return address used was PO Box 186, Waverly, Ohio. One package was shipped from the Wellston, Ohio Post Office, and all others were shipped from Waverly. All of the shipments were paid for using Mastercard credit card ending in 8113 or cash. The Mastercard ending in 8113 has been identified as belonging to Howell's Peoples Bank account and has been used previously to pay for shipping of steroids.

77.    In mid-October 2022 investigators were contacted by DEA investigators from Riverside CA. They advised that Anglemyer's cellular telephone number, (740) 941-6273, had shown up

on multiple occasions in phone tolls for the target of their investigation. They also advised the target(s) of their investigation were involved in the distribution of kilogram quantities of cocaine.

78.    In November 2022, a state search warrant was executed on Anglemyer's Facebook account. I know from training and experience that Facebook members often install the Facebook application on their cell phone for ease of use, to post pictures and to message. The search warrant produced information of "direct messages" between Anglemyer and others involved in narcotics distribution. This included sources of supply (SOS), conversations with co-conspirators, and with customers. Anglemyer used his cellphone to document trips to California, via photographs, and to obtain cocaine. Anglemyer also used his cellphone as it related to the sale of steroids which he shipped through the USPS.

79.    Specifically, as learned from the contents obtained from the search warrant executed on Anglemyer's Facebook account, investigators noted that on April 13, 2021, Anglemyer traded "direct messages" with a ███████████████████. The conversation documented that ██████ put in an order to purchase steroids from Anglemyer. Once the order was complete, Anglemyer took a picture of the USPS receipt that displayed the tracking number for the package and sent it via "direct message" to ██████ to confirm his order had been sent. In addition to the package mailed on April 13, 2021, documents received from the Facebook search warrant revealed photographs of USPS receipts for other packages mailed to ██████ on: 04/28/2021, 05/20/2021, 06/30/2021, 11/19/2021, 12/09/2021, 02/25/2022, 02/28/2022, and 04/11/2022.

80.    The Facebook search warrant also revealed that on November 19, 2021, ██████ exchanged Facebook messages with Anglemyer to order 5 grams of "shrooms," a common slang term for psilocybin mushrooms. As noted previously in this affidavit, on November 19, 2021, surveillance was initiated at Anglemyer's residence. Surveillance observed Anglemyer meet with

a man in a gray Ford truck, bearing OH #JLD6625, registered to ███████████████ ████████████████. Agents observed a hand-to-hand transaction occur between the 2 trucks before Anglemyer and Howell returned to the **Market St. Apartment**.

81.     Further Facebook messages revealed that Crace obtained illegal substances from Anglemyer on several occasions up until November 2022 when the Facebook search warrant was executed.

82.     On November 7, 2022, surveillance was established in Waverly, Ohio. Sodaro's Rogue was parked at **TARGET LOCATION 1**. Anglemyer's Ram truck and the blue Equinox known to be driven by Howell were parked at the **Market St. Apartment**. At approximately 3:18 p.m., Sodaro exited **TARGET LOCATION 1**, drove the Rogue to a Whit's Frozen Custard drive-thru, and then drove directly to the **Market St. Apartment**. Sodaro exited the vehicle with nothing in her hands and entered the front door without knocking. At approximately 3:32 p.m., Sodaro exited the **Market St. Apartment** carrying a bag that was half the size of a normal backpack. Howell followed Sodaro outside but remained on the front porch. Sodaro returned to the Rogue and departed.

83.     Sodaro drove to the Post Office on Second Street and parked in the parking lot. Surveillance temporarily lost sight of her vehicle and when they arrived at the Post Office, Sodaro was already inside. At approximately 3:53 p.m., Sodaro exited the Post Office and returned to her vehicle. Within a few minutes of the departure, surveillance lost sight of Sodaro's vehicle.  According to USPIS records, Sodaro had mailed out a Priority Mail package at approximately 3:51 p.m. on November 7, 2022 from the Waverly post office. The package was addressed to ██████████████████████████. The package weighed 10 ounces and was paid for with cash. The package listed the return address as Alex Grey at

**TARGET LOCATION 1**. Alex Grey is an alias that the Anglemyer DTO has used previously when shipping out steroids.

84.     According to law enforcement indices and open-source databases, ███████████ ., ███████████████ is a valid, deliverable address. However, the name ████████ was not found to be associated with this address. On November 18, 2022, a federal search warrant was obtained for this package.

85.     On November 21, 2022, the package was opened and the contents included $7,500.00 United States currency. The cash was in large denominational bills. Based on my training and experience, I know that drug traffickers often use cash for their transactions and that mailing cash is a method used by drug traffickers to make payments while attempting to avoid detection by law enforcement.

86.     Facebook communications between Anglemyer and Sodaro, a co-conspirator, revealed that on November 7, 2022, Anglemyer provided Sodaro with information to mail a package.

Anglemyer: ███████████████████████████████████.

Sodaro: ████████? Not street??

Anglemyer: ████████

Sodaro:  I'll sent it out as soon as I drop your food off

Anglemyer:  And she did pull the 7500 from the white bag correct

Sodaro:  I'm double checking

Anglemyer:  Get that tracking?

Sodaro responded with a photograph of a USPS receipt with tracking number 9505513945972311619351. The Priority Mail package with this tracking number was mailed from the Waverly, Ohio post office and sent to Lake Elsinore, CA 92530.

87. On November 16, 2022, Facebook messages between Sodaro and Anglemyer indicated they were still attempting to locate and track the package mailed out on November 7, 2022.

> Sodaro: I called the post office in lake Elsinor and they are supposed to call me back
>
> Anglemyer: Okay babe
>
> Anglemyer: His people are headed there too
>
> Sodaro: I called back out there and he said the driver doesn't remember having that package and it could have been another person that scanned it
>
> Anglemyer: So yeah I'm fucked
>
> Sodaro: Not yet. I'm calling to file a claim.

88. Investigators were advised that ███████████████████████ was an address associated with a cocaine trafficking organization that was under investigation by the DEA San Diego Office. Information from the USPIS investigators assisting DEA-Riverside in their investigation revealed information on the following Priority Mail packages that had been mailed from the Waverly, OH Post Office (45690) to the address of ███████████████ ██████

> ### Date Mailed   USPS Tracking #
> - 04/27/2022 – 9505513945972117566569
> - 05/09/2022 – 9505513945972129569718
> - 06/16/2022 – 9505513945972167580225
> - 06/21/2022 – 9505513945972172581651
> - 06/28/2022 – 9505513945972179583238
> - 08/05/2022 – 9505513945972217594042
> - 08/18/2022 – 9505513945972230597785
> - 09/06/2022 – 9505513945972249602494
> - 10/13/2022 – 9505513945972286612708

89. Based the November 7, 2022 Priority Mail package that was interdicted which contained $7,500 in US currency your affiant has probable cause to believe the Priority Mail packages identified above that had been mailed to ███████████████████ from the

Waverly, OH Post Office (45960) are associated with the Anglemyer DTO and likely contained US currency.

90.     On November 29, 2022, USPIS identified a Priority Mail package that had been sent out from a Riverside, California Post Office and was intended for delivery to Alex Grey at **TARGET LOCATION 1**. The return address was listed as ███████████████████, ███████████████. The package weighed 6 lbs. 15 oz. with postage of $36.15.  The tracking number for this package was # 9505515069262332784l.

91.     According to law enforcement indices and open-source databases, ████████████████, ███████████████  is a valid deliverable address for a self-storage facility named A Storage Place. USPIS agents conducted a K-9 open air sniff of the package and received a positive indication for narcotics.

92.     On December 2, 2022, a federal search warrant was executed on the package. Inside was a shoebox that contained a pair of size 14 men's boots. Hidden inside each boot was a vacuum-sealed plastic bag containing approximately one-half kilogram of suspected narcotics. The total weight of the 2 vacuum-sealed bags was 1158.8 grams. Final lab results identified the substance as cocaine.

93.     Investigators reviewed the IP addresses which had tracked the priority mail packages #9505513945972311619351 and # 9505515069262332784l, which contained $7,500 United States Currency and approximately 1158.8 grams of cocaine, respectively. The subscriber information associated with the IP addresses came back to Anglemyer at **TARGET LOCATION 1.**

94.     Additional information provided by the USPIS Agents assisting DEA-Riverside in their investigation revealed information on the following Priority Mail packages that had been mailed

from Riverside, CA to the addresses of Anglemyer (**TARGET LOCATION 1**) and Arin Sodaro

(**TARGET LOCATION 2**) in Waverly, OH:

| Date Mailed | USPS Tracking # | Address/Occupant | WT |
|---|---|---|---|
| 06/21/2022 | 9405511108036489662046 | **TARGET LOCATION 2** | 2.39 lbs |
| 07/11/2022 | 9505515069312192432237 | **TARGET LOCATION 2** | 6.43 lbs |
| 07/23/2022 | 9505513827082204027509 | **TARGET LOCATION 2** | 7.87 lbs |
| 07/23/2022 | 9505515069312204434594 | **TARGET LOCATION 2** | 7.81 lbs |
| 08/18/2022 | 9505515069292230527388 | **TARGET LOCATION 1** | 7.68 lbs |
| 08/18/2022 | 9505513827062230017637 | **TARGET LOCATION 1** | 7.75 lbs |
| 08/23/2022 | 9505515622872235675647 | **TARGET LOCATION 1** | 5.75 lbs |
| 09/03/2022 | 9505515069272246493389 | **TARGET LOCATION 1** | 7.93 lbs |
| 09/03/2022 | 9505513827072246880187 | **TARGET LOCATION 1** | 8.00 lbs |
| 09/17/2022 | 9505515069312260446029 | **TARGET LOCATION 1** | 7.68 lbs |
| 09/17/2022 | 9505515069312240446036 | **TARGET LOCATION 1** | 8.56 lbs |
| 09/19/2022 | 9505513182272262850759 | **TARGET LOCATION 1** | 7.62 lbs |
| 09/19/2022 | 9505513182272262850766 | **TARGET LOCATION 1** | 7.68 lbs |
| 10/07/2022 | 9505515622882280451066 | **TARGET LOCATION 1** | 11.18 lbs |

95.    On February 2, 2023, a Confidential Source (CS) alerted the Columbus, Ohio DEA

Airport Group of a suspicious ticket purchase for Mark Anglemyer and Arin Sodaro that was

made on January 30, 2023. Anglemyer and Sodaro purchased one-way tickets to fly from

Columbus, Ohio (a destination city for illicit narcotics) to Los Angeles, California (a source city

for illicit narcotics), scheduled for departure on February 2, 2023. I know that it is common for

narcotics traffickers to travel to narcotics source areas using tickets purchased shortly before

their departure.

96.    On February 2, 2023, at approximately 4:40 p.m., investigators monitored passengers at

Gate B35, the gate set for the departure of Anglemyer's and Sodaro's flight. Agents were able to

positively identify Anglemyer and Sodaro sitting together at the gate. Agents confirmed that both

Anglemyer and Sodaro boarded the flight.

97.    On February 3, 2023, Sodaro was identified at a Riverside, California U.S. Post Office

where she mailed out a package. The package was addressed to ████████, 2247 Waldren



Hill Road, Piketon, Ohio 45661 with a return address of ███████████████████████,
███████████████.

98.    According to law enforcement indices and open-source databases, 2247 Waldren Hill

Road, Piketon, Ohio 45661 is a valid, deliverable address, but the name ██████████ is not

associated with the address. However, agents know this to be the residence of Blake Mankin, an

identified member of the Anglemyer DTO. Investigators have not been able to find evidence of a

████████, nor the address of ███████████████████.

99.    On February 3, 2023, a police K9 positively alerted to the package shipped by Sodaro.

USPIS investigators intercepted the package at the San Bernardino Processing and Distribution

Center. A subsequent search warrant revealed a shoebox which contained a pair of tactical boots.

Hidden inside each boot was approximately one-half kilo of suspected cocaine vacuum sealed in

clear plastic bags. This shipment method and packaging matched the other package of cocaine

that was intercepted on or about November 30, 2022. A field test of the cocaine yielded positive

results for cocaine.

100.    USPIS Agent's assisting DEA-Riverside in their investigation also provided historical

information on 2 Priority Mail packages that had been mailed from Riverside, CA to 2247

Waldren Hill Road, Piketon, Ohio 45661, Blake Mankin's address:

| **Date Mailed** | **USPS Tracking #** | **WT** | **Date Delivered** |
|---|---|---|---|
| • 11/17/2022 – 9505515622872321695825 – 8.43 lbs. – 11/19/2022 | | | |
| • 11/17/2022 - 9505515622872321695832 – 8.56 lbs. – 11/19/2022 | | | |

101.    Additional information from the search warrant executed on Anglemyer's Facebook

Account (1399133843) documented direct messages between Anglemyer and ██████████, a

former source of supply for cocaine, on 11/25/2022. During the course of the conversation,

Anglemyer offered to begin supplying █████ with cocaine. Anglemyer further offered to show

██████ how to "re-rock" cocaine (add filler/cut) to increase the profit margin. Anglemyer stated, "I have 97% raw uncut / Cartel stamped" (cocaine).

102.    Based on your affiant's knowledge of the investigation and operations of the Anglemyer DTO combined with the information provided by the investigators in Riverside, CA your affiant has probable cause to believe the Priority Mail packages mailed from Riverside, CA to Waverly, OH contained narcotics, specifically cocaine, and the Priority Mail packages mailed from Waverly, OH to █████████████████████ contained US currency, specifically proceeds derive from the sale of narcotics.

103.    In February 2022, Anglemyer was arrested in Conway County, AR while in possession of approximately 300 lbs. of marijuana that was found in a rental vehicle Anglemyer was driving. In addition, state troopers/officers seized $5,511 in US currency from Anglemyer. On April 19, 2022 Anglemyer was indicted on a State of Arkansas Class A Felony – for Possession with the Intent to Distribute. On February 15, 2023 Anglemyer pleaded guilty to a reduced charge of Possession of Drug Paraphernalia and was sentenced to a suspended sentence of 36 months, no probation, a $1,000 fine, and forfeiture of the seized $5,511.

104.    In early June 2023, DEA-Columbus OH was advised by DEA-Riverside CA that the targets of their investigation had been indicted on federal narcotics violations, specifically cocaine. The source of supply of cocaine for the Anglemyer DTO was arrested.

105.    Investigators received information on July 5, 2023 that Anglemyer and Arin Sodaro had purchased airline tickets to travel from Columbus, Ohio to Medellin, Colombia on July 16, 2023. According to the airline records the contact/payment information address for Anglemyer was **TARGET LOCATION 1**, a contact phone number of 740-835-9073, and a contact e-mail address of arin.sodaro@gmail.com.

106.   According to the American Airlines flight itinerary, Anglemyer and Sodaro were scheduled to return to the United States from Colombia on July 22, 2023. They were scheduled to fly from Medellin, Colombia to Orlando, Florida and then to Columbus, Ohio

107.   Based on this intelligence information contact was made with DEA's Colombia Office regarding Anglemyer and Sodaro's flight itinerary. Agents confirmed that Anglemyer and Sodaro did in fact travel to Medellin, Colombia, but they did not arrive until July 17, 2023. Their flight from Miami was cancelled due to weather and they were booked on another flight the following day.

108.   According to border crossing information, Anglemyer and Sodaro returned to the United States from Medellin, Colombia on July 22, 2023 and were processed through the CBP/Immigration Office at Orlando, Florida International Airport. CBP officers encountered Anglemyer and Sodaro. Anglemyer and Sodaro were provided with CBP Publication N. 2123-1215 "Inspection of Electronic Devices." Anglemyer and Sodaro provided consent to have their cellphones searched/downloaded and provided their access codes to open their cellphones.

109.   Sodaro's cellular telephone was an Apple iPhone with telephone number (740) 835-4980. During the preliminary "hand" search of Sodaro's cell phone, CBP discovered a photograph sent via Whatsapp of a FedEx package label dated July 21, 2023 with the tracking #781460885710. The package had been shipped from a FedEx office in Medellin, Colombia and was addressed to a ███████████████████████████████████, which is next door to Anglemyer's **Market St. Apartment**. According to the FedEx receipt, the package had a gross shipping weight of 4.50 kilograms (approximately 9.9 pounds).

110.    The package was designated as undeliverable and sent to a Colombian government warehouse. Colombian Customs advised that the FedEx package with tracking #781460885710 contained approximately 396 grams of white, powdery substance that tested positive for cocaine.

111.    Investigators have confirmed through the use of utility records that ████████ was a previous resident at ██████████████████, but had not resided there since June 24, 2022. At the time of the shipment described above, ████████████████████, was occupied by an ██████████.

112.    Based on your affiant's knowledge and experience, your affiant knows that drug traffickers use false/fictitious information to send and/or receive narcotics via parcel packages. Your affiant further knows that it is not uncommon for narcotics traffickers to ship drugs to addresses not directly related or tied to the drug trafficker such as vacant lots or addresses close in proximity to their own address. The narcotics trafficker is then able to watch the tracking information for the package and easily retrieve the package from the nearby or vacant address upon delivery.

<u>Electronic Extraction of Anglemyer's and Sodaro's Cell Phones</u>

113.    CBP Officials also conducted an "electronic (software) extraction" of both Anglemyer's (740-835-9073) and Sodaro's (740-835-6490) cellular telephones for contacts, calls, and texts.

114.    The electronic extraction of Sodaro's cellular telephone included text messages between Sodaro and a contact listed as ██████" with telephone number ████████. Agents identified this telephone number as registered to ████████████████. Anglemyer had the same telephone number listed as "████" in his contacts. Text messages between the 2 involved the organization's illegal activities, to include drug trafficking and money laundering activities.

115.    On November 16, 2022, Sodaro and ██████ exchanged text messages regarding the previously mentioned US Mail Priority Mail package that Sodaro mailed from Waverly to Lake Elsinore, California on November 7, 2022. That package had been seized by USPIS and was found to contain $7,500 in US Currency.

████ : How is JR [Mark Anglemyer]

Sodaro:  He's okay ish

████ : My heart aches for him. He tries so hard

Sodaro:  He's devastated. But I told him we will do everything we can to get to the bottom of this and in the mean time we will keep doing what we do.

████ : I know he is!  And I feel so helpless. No one is taking a bigger risk then him…and he always seems to get the short end of the stick. I just hope this all pays off soon.

Sodaro:  It will

116.    On December 2, 2022, Sodaro and ██████ had the following text conversation regarding the previously mentioned Priority Mail parcel seized on December 2, 2022, that contained approximately one kilogram of cocaine.

████ How is JR [Mark Anglemyer]

Sodaro:  He's okay

████ : That doesn't sound good

Sodaro:  Just more and more keeps piling on

████ : Like what?  His phone

Sodaro:  Phone. ████████ still owes and is ghosting him now

████ I think he [Mark Anglemyer] needs to beat his [████████] ass

███ : I'm sure the package will arrive…it's not supposed to be here till tonight.

Sodaro:  I went to the post office. They said it wasn't scanned early this morning it's not coming today.

███ : So what does that mean?

Sodaro:  Could just be delayed. They are slammed with Christmas stuff.

███ : Do they know if it's lost

███ : Or is it just delayed

Sodaro:  He said it's probably sitting on a truck somewhere

███ : Oh Ok!  So no reason to panic!

Sodaro:  I'm glad one of us is optimistic

117.    On December 5, 2022, Sodaro and Anglemyer traveled to California. Administrative subpoenas served on United Airlines and Delta Airlines revealed their flight itinerary with travel dates of December 5, 2022 and return travel on December 9, 2022.  Sodaro and ███ had the following text conversation on December 5, 2022, regarding the seized package of cocaine:

███ : Jr [Mark Anglemyer] is in a mood this morning…he's convinced his package isn't showing up. I keep telling him it's the holidays has it backed up.

Sodaro:  I know. We've been talking.

Sodaro:  I can't imagine how he feels right now

Sodaro:  32k just unaccounted for

███ : I told him [Mark Anglemyer] to enjoy this trip [Anglemyer and Sodaro traveled to California] and I'll keep watch for the package this week. I understand but it will come. Your [Sodaro's] package sat up there for a week and then came.

███ : It just the holidays

Sodaro:  I know. If stuff doesn't start moving we are going to lose clientele and we will have to work twice as hard. I'll do it and we will get it done it's just nerve wracking.

██████: Yes it is nerve wracking but we will push through…what other choice do we have!

Sodaro:  We don't

██████: Going back to 9-5 for either of you [Anglemyer and Sodaro] is not an option!

Sodaro:  I know

118.    On December 6, 2022, Sodaro and Mark Anglemyer were in California; Sodaro and ██████ had the following text conversation:

██████: What did the facility [US Post Office] say in Columbus about the package

Sodaro:  Haven't been able to get ahold of them.

██████: Maybe we can call Waverly post office and see if that Aaron guy can help

██████: Maybe he knows how to get a hold of them

Sodaro:  Maybe. I don't even know at this point.

119.    On December 7, 2022, Sodaro and ██████ had the following conversation referencing co-conspirator, Heather Howell, and drug trafficking activities:

Sodaro:  I am so fucking livid with Heather it's not even funny

██████ Yeah she's a bitch

Sodaro:  She never even had the conversation with me about ██████████]. Just shit talked me to jr [Mark Anglemyer]

██████ She's so fucking lazy it's insane

██████ She could have called you and expressed her concerns. What did she say to him [Mark Anglemyer]

Sodaro: To just dodge the responsibility of a fucking human being while I'm 2000 fucking miles away [Sodaro was in California with Anglemyer]

Sodaro: That this is my second trip without kids. How I'm running all the time with the white [slang term for cocaine]. I don't even know what else. When he [Anglemyer] was talking I couldn't even focus I was just seeing red.

Sodaro: Any respect I had for her [Howell]. Fucking gone.

████ Did she say something to jr [Anglemyer] to have someone come get him ████████████ ]? You are running all the time with the white [cocaine] because you are WORKING. something she knows nothing of

Sodaro: He [Anglemyer] told her [Howell] we [Sodaro and Anglemyer] were going to leave early and forget the rest of it. I said I would ask ████████████ ]. If I would have left him [████] there she [Howell] would have bitched all day every day until we got back [from California]

████ : You guys aren't leaving early now..? Since ████ has ██ …

████ : She [Howell] is so useless

Sodaro: Correct. We are staying [in California]

████ : Dude she's [Howell] just a lazy ass person. You did nothing wrong…why should be shame ourselves as moms because we go somewhere without our kids. Men do it all the time.

████ : Also this wasn't. A pleasure trip it is a work trip! And there will be others to come also

Sodaro: Right

███ : She [Howell] sits over there [**Market St. Apartment**] all day and sleeps and gets

High whenever she wants…goes shopping with ████████████████ ] whenever she

wants and everything is paid for! [Anglemyer pays the bills at the **Market St.**

**Apartment**]. She doesn't earn anything

Sodaro:  She is on my fucking shit list. I'll work with her and nothing more

███ : I understand that

███ : I know girl I understand, she [Howell] crossed a line that can't be uncrossed. It all

boils down to her wanting to live over there [**Market St. Apartment**] Scot free. And not

being bothered by anyone. And she can go drink and go to the Beast and fuck off

whenever she wants. It doesn't work that way!  She isn't a fucking princess

Sodaro:  She's [Howell] mad because I jumped into this life and she can't

███ : Cause she's a weak person

Sodaro:  She still hasn't said a word to me

Sodaro:  No, hey thank you for finding someone else. I'm sorry I couldn't hack it. Noting

███  Well good lord!  She [Howell] isn't moving her ass to sell more Green [slang

term for marijuana] and bills need to be paid. I'm sure she'd have something to say if her

rent didn't get paid

Sodaro:  Jr [Anglemyer] wanted me to come out here [to California] to meet Cali jr

[Dario Alejandro Labrada Lopez, the SOS for cocaine in California] so he [Anglemyer]

could tell him [Labrada Lopez] that I am the one to take over [the cocaine portion of the

business] if something happens to him [Anglemyer]. She [Howell] can't do this shit.

Sodaro:  And she [Howell] couldn't be with us [in California] for him [Anglemyer] to tell

jr [Labrada Lopez] that. She'd lose her mind if she knew that's how this was all going.

120.    On January 31, 2023, Sodaro and ⬛ had the following text conversation regarding an upcoming trip to California:

⬛ :  Are you excited to go to LA again

Sodaro:  Dude. I'm jazzed. I have never felt at home in a random place in my life.

Sodaro:  This one is a little more nerve wracking though

⬛ :  Good deal!  I'm sure everything will be just fine!

⬛  Enjoy your trip

Sodaro:  I'm sure it will too. I just want this key [kilogram of cocaine] to get back on time

⬛  Right I understand that

⬛  I will keep an eye out if he sends it here [**TARGET LOCATION 1**]

121.    On February 3, 2023, Sodaro and ⬛ had the following text conversation regarding the package of cocaine that Sodaro mailed from the Post Office in Riverside, California to 2247 Waldron Hill Road, Piketon, Ohio, Blake Mankin's residence:

⬛  Did y'all make it ok

Sodaro:  We did. I'm sorry I didn't want to wake you when we got here.

⬛  No worries!  Just wanted to check on you guys

⬛ :  You guys ok?

Sodaro:  Yeah. He's [Mark Anglemyer] asleep. I mailed that pack [US Priority Mail package] earlier.

⬛ :  Ok I was worried I couldn't get a hold of you guys

Sodaro:  I fell back asleep for a bit. The time change gets me.

⬛ :  I understand!  When is the pack supposed to arrive

Sodaro:  Monday [February 6, 2023]

122.    On February 6, 2023, Sodaro and ███ had the following text conversation regarding the package of cocaine that Sodaro mailed on February 3, 2023. The package was supposed to be delivered on February 6, 2023.

███ Jr [Mark Anglemyer] is slipping over this package not updating yet

Sodaro:  I know

███: It will be fine! They are so efficient with overnight packages

███: He [Mark Anglemyer] needs to calm down

Sodaro:  It hasn't updated since the 3rd

███: So they've fucking lost another one

Sodaro:  I can tell she's [Heather Howell, a member of the Anglemyer DTO] trying to leave me out of shit. Saying things like mark and I will do it on the group message

Sodaro:  I fucking hope not. I can't fucking breathe right now

███: You can't breathe because of heather?

Sodaro:  No. Hell no. The package

Sodaro:  I was up all night checking the tracking. Hoping it would update.

███: They said it would arrive today?

Sodaro:  That's what it says

Sodaro:  But no update on the tracking

███: God damn I hate the postal service

Sodaro:  If this doesn't come in. We are done

███: Yes I know

Sodaro:  There's no way to fix it

Sodaro:  We will all have to go back to 9-5

███████   Yeah I know

Sodaro:  I'm sick to my stomach

███████ : I mean Jesus

Sodaro:  This was the be all end all

███████   We don't know it's not coming

███████ : It's not even late yet

Sodaro:  It hasn't even updated since the day I sent it

███████ : It could update at any point today…it's an overnighted package it will be here

before we know it

Sodaro:  Ther is no conceivable way that package is going to get here today if it's still in

Cali right now.

███████ : Can you try to call the post office

Sodaro:  It won't do any good. They will say what they always do. "If it's not showing a

scan it didn't come here."

███████   You dropped it off there…did they scan it in front of you

Sodaro:  Yeah. It shows the lake elsinore scan and arriving at San burnadino

Sodaro:  That's it

Sodaro:  They have to scan it to verify the address and process the sale

███████ : The post office is fucking horrible

███████ : It may just be a day or so late

Sodaro:  If it's more than a day late I can almost bank on the fact that it's not coming

███████ : Let's give it till tomorrow or Wednesday and see if it updates

Sodaro: Even if he [Mark Anglemyer] has to get another one on credit. Which he won't. But we would be able to make it work and pay it over time. But he's just not going to.

Sodaro: This will change him [Mark Anglemyer]. It's not just the white [cocaine]. It will kill the restaurant too.

████ : I agree he won't get another one [kilo of cocaine] on credit. Because he already owes him [SOS in California] another 25 k. Yes I know. My heart is just aching thinking of it.

████ : I'm sure he's wanting to go drink

Sodaro: If he sells the cars [1968 Chevrolet Chevelle and 1969 Pontiac GTO] that will give him the income he needs to get the restaurant [Lupo Nero Italian Cuisine] up and running. At least pay off one of the keys [kilograms of cocaine] and have some as a buffer for bills and what not in the mean time.

████ : Will he even want to start the restaurant

████ Yes that's true! It just makes him feel so bad…I just don't want his dream to fail

Sodaro: I know. Same here.

Sodaro: What do you want for dinner?

████ : A key of snow [kilogram of cocaine]

123. On February 9, 2023, Sodaro and ████ had the following text conversation regarding the package of cocaine that Sodaro mailed at the Riverside, California Post Office on February 3, 2023:

Sodaro: She [Heather Howell] just came over. Jr [Mark Anglemyer] is stressing over the packages. He's getting paranoid that something's going on with them.

███ :  There is no way!  There is no way they would be able to track that!  We used different addresses and all different name.

Sodaro:  I know. He's worried about a controlled delivery

███ :  Well he can see that coming

███ :  If they ask anyone to sign then say no

Sodaro:  It's just the possibility of that hanging over him. He wants to protect all of us

███  I completely understand that. But we all know not to sign for anything.

124.    The electronic extraction performed on Sodaro's cell phone by CBP in Orlando also revealed Sodaro and ███████ had several text conversations, below, regarding a bag of cash, presumably drug proceeds, kept at **TARGET LOCATION 1**. The extraction performed on Anglemyer's cell phone also revealed a conversation, also below, between Anglemyer and Sodaro regarding the bag as well.

- On February 17, 2023, Sodaro and ███ had the following text conversation:

    Sodaro:  Would you care to put money in his [Anglemyer's] accounts today. Or have Heather [Howell] do it. 2000 in his 5/3 and 1000 in his atomic.

    ███  Yeah I can is he out of money?

    Sodaro:  Not out. Just doesn't want to cut it short

    Sodaro:  We didn't grab cash like we planned because we are both absent minded lol

    ███  Ok his 5/3 account is at $500

    Sodaro:  We made it to San Diego last night

    ███  Great news

    Sodaro:  That's where I figured it was at [5/3 account balance]

██ : I'm headed to Lucasville shortly and I can drop it off

██ : Send me his atomic account number

Sodaro:  I just give them his social [security number]. Neither of us know his actual account number

██ : Ok

Sodaro:  Will you let me know when you put that in his accounts?

Sodaro:  He [Anglemyer] said he can't check his atomic. As long as you have him his name and social it will go in. That's how I do it all the time.

██ : The money is in there

Sodaro:  Thank you!!!

Fifth Third Bank records document that on February 17, 2023, a cash deposit of $2,000 was made into Anglemyer's personal checking account ending in 5052. Records from Atomic Credit Union document that on February 17, 2023, a cash deposit of $1,020 was made into Anglemyer's credit union account.

- On March 8, 2023, Sodaro texted ██ "What do you want to eat. I'll swing thru and get you guys something. It's going to be a long ass night."  Then, "I need to bring money back to the house [**TARGET LOCATION 1**] anyway"

- On March 13, 2023, Sodaro and ██ had the following conversation:

  ██ Don't forget to put money in JR's [Anglemyer's] atomic account

  Sodaro:  I have money already out for his atomic

On March 13, 2023, a cash deposit of $1,000 was made to Anglemyer's Atomic Credit Union account. The account was overdrawn prior to the deposit.

- On April 12, 2023, Sodaro and ██ had the following text conversation:



 He's [Mark Anglemyer] down to $15 in his 5/3 account

Sodaro: Do you have enough to transfer in his [Mark Anglemyer] and take cash [from **TARGET LOCATION 1**]. Without having his debit card they make it harder for me to just walk in and do it.

: Yeah that's fine! How much?

Sodaro: $1,500 if you can. I have $1,000 sitting on the dresser for that account. And we can get the other $500 out of the bag. [At **TARGET LOCATION 1**.]

: Ok I'll take care of it. Thank you

On April 12, 2023, $1,500 was transferred from Mark and  joint account with Fifth Third Bank to Mark Anglemyer's personal checking account with Fifth Third Bank.

- On April 22, 2023, Sodaro and  had the following text conversation:

Sodaro: Do you want to ride with me to go get ]?

 Sure! I thought you already left….

Sodaro: I just came to my house [**TARGET LOCATION 2**] to grab that money for the bag and change. I'm coming right back [to **TARGET LOCATION 1** where the bag is located.]

: Ok girl yeah I'll go

- On April 27, 2023, Sodaro and  had the following text conversation:

 Jr [Mark Anglemyer] needs some money deposited. I'll go ahead and put $1,000 in there right now. And I'll deposit it [cash] back into my account.

Sodaro: I was just about to go pull money out of the bag [at **TARGET LOCATION 1**] for both accounts. How low did he get?

: Like $100

Sodaro:  Shit!  I'll put another grand in it and get your money back out too

Sodaro:  We are supposed to go to Verizon and the bank after awhile anyway.

███ : Ok I just put $1,000 in his 5/3 account. He's up to $1107 now

Fifth Third Bank records indicate that on April 28, 2023, $1,000 was transferred from Mark and

███████ joint checking account ending in 0843 to Mark Anglemyer's Fifth Third

Bank personal checking account ending in 5052. That same day a $1,200 cash deposit was made

to Mark Anglemyer's Fifth Third Bank account ending in 5052. It appears the deposits were

made late enough on April 27, 2023, that the bank posted the deposits on the following day.

- On May 19, 2023, Sodaro and ███ had the following text conversation:

  Sodaro:  The money bag in the drawer [at **TARGET LOCATION 1**] is low and I

  think he's [Mark Anglemyer] pissed about it.

  ███ :  I'll be headed back in 10

- On May 27, 2023, Sodaro and ███ had the following text conversation:

  ███   Hey girl!  Don't forget about putting money in JR's [Mark Anglemyer]

  account

  Sodaro:  I know. I'm going to go up in just a bit.

  Sodaro:  I'm heading over [to **TARGET LOCATION 1**] to grab money

  ███ :  Ok girl!  Thank you!

  Sodaro:  I got 1300 so you can take your 300 back

Records from Fifth Third Bank show a cash deposit of $1,500 on June 1, 2023 to Anglemyer's

personal checking account ending in 5052. On this same date $400 was transferred into

Anglemyer's personal checking account ending in 5052 from Mark and ███████ joint

checking account ending in 0843. Later, $400 was transferred from Anglemyer's personal

checking account ending in 5052 back to their joint checking account ending in 0843. Note:
May 27, 2023 was a Saturday, and Monday, May 29, 2023 was Memorial Day.

- On July 4, 2023, Sodaro and Anglemyer had the following text conversation:

  Sodaro:  I need to come get money from the bag from where I paid ██ and the
  aep for the shop.

  Sodaro:  And I'm going to put more money in your account

125.    Additionally, there were text conversations, below, on both Anglemyer's cell phone and
Sodaro's cell phone regarding drug trafficking activities. Multiple conversations discussed
Sodaro making a "run," which commonly refers to the act of taking narcotics to a customer
and/or collecting money from a customer. One conversation revealed the location for "brewing"
and processing customer orders. Other conversations indicated customers and a fellow DTO
member making payments to Sodaro and/or ██

- On December 23, 2022, Sodaro and ██ had the following text conversation
  regarding "blow," a common slang term for cocaine.

  ██ : Maybe your brother will do some of the blow you gave ██
  Sodaro:  Haha. Doubtful. They piss test them when they go back. He's a chicken
  shit

  Sodaro:  Holy fuck it is so cold outside. I have to go make a run

  Sodaro:  I'll be over in a few

- On December 25, 2022, Sodaro and ██ had the following text conversation
  referencing another delivery to a customer:

  Sodaro:  Should I come back down or just meet you at the house [**TARGET
  LOCATION 1**]. I just got done with that run

- On January 13, 2023, Sodaro and ▮▮▮ had the following text conversation regarding Sodaro delivering to customers:

  Sodaro:  Just pulled in. Had a run

  Sodaro:  Okay. I'm waiting on my second person to show.

- On January 26, 2023, Sodaro and ▮▮▮ had the following text conversation:

  Sodaro:  Blake [Mankin, a co-conspirator] might be bringing money over to you [▮▮▮▮▮▮▮]

  Sodaro:  He [Mankin] said he was headed in town

  ▮▮▮  Ok

- On February 17, 2023, Anglemyer and ▮▮▮▮ (a cocaine customer) had the following text conversation:

  ▮▮▮ :  I ran into ▮▮▮ and I had that cash on me and I gave it to her. I didn't need to run around with it

  ▮▮▮ :  I feel better her having it

  Anglemyer:  ▮▮▮▮

  ▮▮▮ Yes sir

  ▮▮▮ :  1000

  Anglemyer:  Ok brother

- On February 19, 2023, Anglemyer and ▮▮▮▮ (a cocaine customer) had the following text conversation:

  ▮▮▮ :  ▮▮▮ has the money for the stuff you left

  Anglemyer:  Ok brother

- On February 20, 2023, Anglemyer and Junior (951) 581-5988 [California SOS] had the following text conversation:

    Anglemyer:  Thank you brother. Prices of all items and pics would be awesome

    Junior:  Do you have what's up [WhatsApp] on this number

    Anglemyer:  One sec brother I'll download it

- On February 28, 2023, the following text conversation took place:

    Sodaro:  Blake [Mankin] just paid 4k

    ███  Great!!!!

    ███ :  Have you spoken to ███

    Sodaro:  He's paying some today

    ███  Get it girl!!!

    ███  You go!

    ███ :  They scared of Arin!

    Sodaro:  I've got ███ paying today too

    ███  Yeahhhhh

- On April 26, 2023, Sodaro and ███ had the following text conversation:

    ███  Are we still making dinner?

    Sodaro:  I'm running stuff [controlled substances] to two impatient assholes right now and then I can!  I had to take oil out to Blake [Mankin, a co-conspirator]

    ███ :  It's up to you. We can wait if you think it's too late

    Sodaro:  It will probably be another 35 or 40 min as long as nobody else [drug customers] messages

- On June 22, 2023, Anglemyer had the following text conversation with a contact listed as ███████" at cell phone number ███████████.

  ███████ :  Bro

  ███████ :  I'm sorry last time I didn't answer you because I couldn't

  ███████   I need some green [slang term for marijuana]

- On June 27, 2023, Sodaro had the following text conversation with a contact listed as ████████ at cell phone number (█████████. Investigators identified ████ █" as ████████████ of Waverly, Ohio.

  ██████ :  I can get it however is easier for you guys. I can meet you when I'm off work if you like.

  Sodaro:  I don't care to bring it out. Just let me know what works for you.

  ██████   Hey. That was the wrong order

  Sodaro:  I need to get that back from you

  Sodaro:  I'm sorry. Things keep getting mixed with Blake [Mankin] and his "help"

- On June 30, 2023, the following text conversation took place:

  ██████   Are you at the house [**TARGET LOCATION 1**]

  Sodaro:  We [Sodaro and Anglemyer] are at mine [**TARGET LOCATION 2**]. Brewing an order. Almost finished.

- On June 30, 2023, Anglemyer had the following conversation with ████████"

  ██████ :  Ey bro [This text was sent just after midnight.]

  Anglemyer:  Sorry bro I was asleep and [Reply was sent after 7 a.m.]

       █████: ok I understand and sorry bro I just wanted to get some snow [slang term for cocaine]

- Also on June 30, 2023, Anglemyer had the following text conversation with a contact listed as "████████" with telephone number ██████████

       Anglemyer: Do you know where the vials are

       ████ Blake [Mankin] said they were at his house still

- On July 1, 2023, Sodaro had a text conversation with cell phone number ████. Investigators identified this telephone number as being associated with █████████████.

       ████ If you're out and about later I have someone wanting [drugs]

       Sodaro: We just sold out yesterday. Should be good to go soon

       Sodaro: I can let you know when we have more

       ████ Cool

- On July 2, 2023, Sodaro and ████ had the following text conversation about processing steroid orders for customers:

       Sodaro: He [Anglemyer] texted me at like 6 and said he wasn't feeling good because I was supposed to get him [from **TARGET LOCATION 1**] at 10 so we could get these orders done [steroid orders][at **TARGET LOCATION 2**]. I told him to sleep until he was ready to get up and we would get them done so he could sleep again lol.

       ████: Throwing up could have just been that heavy dinner not wanting yo digest very well since he's on a higher dose of the heartburn meds and he has less stomach acid.

Sodaro:  I told him I wouldn't josh him if he had to sit down for a little bit in

between batches [of brewing steroids]. Lol

- On July 3, 2023, Sodaro and ██████ had the following text conversation

referencing the steroid orders they processed the previous day:

██████  Did you have to run something [make a delivery to a customer]

Sodaro:  No I came over to my house [**TARGET LOCATION 2**] to put these

labels on and take a shower

- Sodaro traveled to El Paso, Texas on July 7-10, 2023. Based on the conversation,

agents determined Sodaro drove to Texas alone and picked up cocaine. Sodaro and

Anglemyer communicated via text during Sodaro's trip to El Paso, Texas. Below are

pertinent portions of that text conversation:

Sodaro: Illinois

Sodaro:  Oklahoma

Sodaro:  I'm 120 from Amarillo

Anglemyer:  Ole Amarillo

Sodaro:  New Mexico

Sodaro:  Physical pain, exhaustion, over stimulation. No physical conversation

with another human in 24 hours. A lot of extremes

Sodaro:  I just want to come home

Anglemyer:  I know babe it'll be over soon

Sodaro:  I can't leave Monday until 2 or 3

Anglemyer:  It'll be ok babe

Sodaro:  I was just letting you know what they said

Sodaro:  This place is damn near in Mexico lol

Sodaro:  I asked the bar tender and she's said even in this scene it's hard to find people who would. A lot of people in this area try to distance themselves from anything that would be stereotypical

Sodaro:  I've got one more group I have my eye on. If that's a bust. This isn't the town to connect in.

Anglemyer:  Be cautious

Sodaro:  Very. More than you even know.

Sodaro:  These people are good to me. But I don't assume it's out of the kindness of their heart. You've thought [taught] me better

Anglemyer:  Good girl

Sodaro:  I'm starting to get the impression that El Paso is kind of like Columbia [Colombia]. They are trying to get away from the Juarez stigma

Sodaro:  I'm stealing this other group out. I don't know babe

Sodaro:  Staking not stealing lol

Anglemyer:  Don't

Anglemyer:  Leave it be

Sodaro:  Are you sure

Anglemyer:  Before word gets around your asking too much

Sodaro:  I have only asked the bar tender

Anglemyer:  Go to the app

Sodaro:  I'm going to leave soon

Sodaro:  I'm going to take the white back to my room. I'm done here

Anglemyer:  Ok babe

- On July 13, 2023, Sodaro and ██████ had the following text conversation

referencing packages being mailed out:

Sodaro:  He's [Anglemyer] good. He went with me to take███. He was not about

staying there. Lol

████   Lmao that's too funny

Sodaro:  He's [Anglemyer] eating with ███. I had to run these packs to the post

office [Packages of customer orders of steroids]

126.    When CBP Officials conducted the electronic extraction of Anglemyer's (740-835-9073)

cellular telephone in Orlando, it revealed that Anglemyer had several apps installed on his phone

to maintain anonymity while conducting business and personal exchanges, i.e., VPN apps, TOR

Browser (an anonymous browser that blocks tracking and surveillance of websites visited),

Proton Mail (encrypted email service), Phoner (provides unlimited temporary phone numbers to

protect privacy),  SPV (photo vault app). Anglemyer also had banking apps, travel apps, and

messaging apps on his phone.

127.    Based on the apps listed above, investigators have reason to believe that Anglemyer uses

his iPhone to communicate, browse the internet, conduct banking transactions, maintain secure

photos and/or files, and send/receive money using encrypted services. Agents in Orlando

disclosed that Anglemyer's WhatsApp was locked down with facial recognition, and therefore,

were not able to access messages located there. The electronic extraction also revealed the

iCloud feature on Anglemyer's iPhone, with Apple ID and iCloud ID of

markanglemyer@mail.com, was "enabled" at the time.

128.    A review of the extraction of Anglemyer's phone when he returned to the United States from Colombia revealed that Anglemyer exchanged text conversations referencing other encrypted messaging apps:

- On March 11, 2023, Anglemyer and "Junior" (951) 447-9637 [California source of supply] had the following text conversation:

    Junior:  New num brother junior

    Anglemyer:  Yes sir

    Anglemyer:  Thank you brother

    Junior:  Ty brother [Thank you]

    Junior:  [Photograph sent]

    Junior:  That's my session brother

    Anglemyer:  Ok brother awesome!!

    Junior:  Messaged you

    Junior:  Not sure how it works

    Anglemyer:  Pretty easy once you get the hang of it

- On March 27, 2023, Anglemyer and Junior had the following text conversation:

    Anglemyer:  Sent you a message on the app brother

129.    According to subpoenaed airline records, on May 22, 2023, Anglemyer and Sodaro flew from Columbus, Ohio to Los Angeles, California on Spirit Airlines. Their return trip was scheduled for May 25, 2023, also on Spirit Airlines. On May 22, 2023, Anglemyer and Junior (909) 285-5651 had the following conversation:

    Junior:  Call me when you arrive

    Anglemyer:  Who is this

Anglemyer:  I'm still on the plane bro

Junior:  Jr

Junior:  I'm expecting u

Junior:  I was told u would be here the 22nd

Anglemyer:  Can you download the app again bro

Junior:  Call me

Junior:  It will be fast

The text conversation continued approximately 30 minutes later.

Anglemyer:  Waiting for the bus to take me to the rental car. Here is where I tried

to get ahold of you brother. When I could t [couldn't] I thought well if he's laying

low I should wait to hear back from him

Junior:  Ty brother I see that

Anglemyer:  I'd like to fix this and move forward

Junior:  Im a man of my word you'll be ok don't worry about it brother like I said

I give u my word…yes I would love that

Junior:  Come inside like before brother

Anglemyer:  Ok bro

Anglemyer:  Garage

Junior:  Yes sir

The text conversation continued approximately 15 minutes later.

Anglemyer:  I'm glad we worked this out my brother

Junior:  Yes sir ty for having the balls to come brother

Anglemyer:  I wouldn't have it any other way brother

Junior:  Means a lot brother

Anglemyer:  My friendship with you means everything

Junior:  Have a good night and a nice stay

Junior:  I see you're a solid person bud

Anglemyer:  Coming from you that honors me greatly

Junior:  Will be in touch brother I'll reach out with another number soon.

Junior:  I told the other dude everything went well brother u can tell him the same

Anglemyer:  Ok brother I will

Junior:  So we are pending with 52 brother just to be on the same page

Anglemyer:  Yes sir

Based on my experience and knowledge of the investigation, I believe Anglemyer and Junior, the California SOS, were discussing the amount of money owed when Junior stated, "So we are pending with 52 brother," meaning Anglemyer owes $52,000.00.

130.    The electronic extraction of the cell phones conducted by CBP in Orlando also revealed messages regarding Anglemyer's and Sodaro's trip to Medellin, Colombia to meet with a newly cultivated SOS for cocaine. This trip occurred right after their cocaine SOS in California was arrested. The following are text conversations regarding the trip.

- On June 30, 2023, Sodaro sent the following text to Anglemyer:

  We need to book that trip [Colombia] tomorrow. I'll put money in your account in [if] there nothing.

On July 3, 2023, a cash deposit of $4,000 was made to Anglemyer's Fifth Third Bank personal checking account ending in 5052.

- On July 5, 2023, Sodaro and ███ had the following text conversation:

Sodaro:  I think all will be fine after Columbia [Colombia] trip

██████ :  Me too

- On July 7, 2023, Anglemyer and ██████ had the following text conversation:

   ██████ :  You are going to take your trip [Colombia] and get what you need [cocaine]. Then come home and run your business and build back so much money

   Anglemyer:  Use the app [encrypted messaging app]

   ██████  Ok

- On July 11, 2023, Sodaro and Anglemyer had the following text conversation:

   Sodaro:  Let them do what they need to do, this trip is the priority and we maintain the rest until we are ready to increase things. Okay

   Anglemyer:  Okay

- On July 16, 2023, Mark Anglemyer and Arin Sodaro were on their way to Medellin, Colombia. Sodaro and ██████ had the following text conversation:

   Sodaro:  Can you transfer $1200 into his [Mark Anglemyer's] account please and take it out of the bag [located at **TARGET LOCATION 1**]

   ██████ :  Yes

Fifth Third Bank records reflect a $1,200 transfer into Anglemyer's personal account ending in 5052 from Mark and ██████████████ Fifth Third Bank joint checking account ending in 0843. The transaction had a posting date of July 17, 2023.

- On July 17, 2023, Anglemyer and Sodaro had arrived in Medellin, Colombia. Anglemyer sent a text to ██████ that read, "Colombia!"  It appears Anglemyer went alone to meet the new SOS for cocaine. The following is a text conversation between Anglemyer and Sodaro that they conducted that day:

Sodaro:  You ok

Sodaro:  Will you please let me know when you [Anglemyer] get there and are heading back. I know you can handle yourself. I just worry too

Sodaro:  I turned my ringer on. You're okay. Enjoy yourself and we will enjoy our evening. Just know all this blow [a slang term for cocaine] will likely mean I'm gonna need your body later tonight if that's okay

Anglemyer:  Ok babe

Anglemyer:  I handed him [driver] a 20 thing and he acted like I gave him a Rolex

Sodaro:  To them that's a lot. I don't think a lot tip.

Anglemyer:  I guess

Anglemyer:  If your clutch took a shit on these mountains it would be a fast scary slide back to the bottom.

Anglemyer:  This is fucking insane

Anglemyer:  This house

Sodaro:  I am kinda jealous I'm not there to see it

Sodaro:  Take a picture of it for me

Anglemyer:  Photo taken [Actual photo was not downloaded as part of the electronic extraction]

Sodaro:  Jesus. That's so cool. I know it sounds strange. But I'm glad you're getting to experience that babe.

Sodaro:  You earned it

Anglemyer:  Thank you babe

Sodaro:  Are you waiting

Anglemyer:  Just viewed the line up [of drugs]

Sodaro:  And?

Anglemyer:  God damn

Sodaro:  Everything you expected?

Anglemyer:  Yes

131.    On August 16, 2023, surveillance was established in Waverly, Ohio. At approximately 8:00 a.m., both Sodaro and Howell exited **TARGET LOCATION 1** and entered Sodaro's Rogue, bearing Ohio registration HJW-9133. At approximately 10:16 a.m., Sodaro returned to **TARGET LOCATION 1** with a young girl.

132.    At approximately 10:34 a.m., Anglemyer and Sodaro exited **TARGET LOCATION 1** and departed in the Rogue. The 2 drove over to **TARGET LOCATION 2**. At approximately 11:10 a.m., Anglemyer and Sodaro exited **TARGET LOCATION 2** and drove the Rogue back to **TARGET LOCATION 1.**

133.    At approximately 11:18 a.m., Anglemyer exited **TARGET LOCATION 1** and climbed into the driver's seat of the Ram truck. At approximately 11:20 a.m., Anglemyer departed. Anglemyer drove over to **TARGET LOCATION 2**, where Anglemyer was observed walking into an open front door with the young girl and a small boy.

134.    At approximately 11:25 a.m., Anglemyer and Sodaro departed from **TARGET LOCATION 2** in the Ram truck. Surveillance units followed as Anglemyer drove to the **Market St. Apartment.** Surveillance units were unable to follow the truck into the apartment complex due to the likelihood of being identified as law enforcement.

135.    At approximately 11:37 a.m., Anglemyer, Sodaro, and Howell departed the **Market St.**
**Apartment** in the Ram truck. Surveillance units followed as Anglemyer drove passed the Post
Office on Second Street in Waverly, Ohio to the Post Office on Forsythe Street in Piketon, Ohio.

136.    At approximately 11:44 a.m., Howell was observed exiting the back, passenger door on
the driver's side as surveillance units set up in the area. Anglemyer remained in the driver's seat.
At approximately 11:48 a.m., Howell left the post office with a receipt in her hand. Howell
returned to the backseat of the truck, behind Anglemyer. Anglemyer departed the area and drove
to Ashland, Kentucky.

137.    USPIS interdiction personnel in Columbus, Ohio were notified regarding the possible
shipment from the Piketon Post Office. Subsequent information revealed that Howell mailed a
total of 6 packages while inside the post office and paid cash for the Priority Mail shipping.

138.    USPIS was able to identify and retrieve one package that was address to "████████████
█████████████████████," with a return address of "███████████████████
███████████." A search of law enforcement and open-source electronic
databases was conducted to determine the validity of the destination information contained on
the package. The address, ███████████," was found to be a valid and deliverable address in
the 76162 zip code, and the name ███████" has received other mailings at this address,
specifically 3 other mailings from Waverly, Ohio. Another search of law enforcement and open-
source electronic databases was conducted to determine the validity of the return information
contained on the package. The return address, "███████████████ was determined to be an
invalid address and is not served by the USPS. The search also revealed there is no ██████████
in Pike County, Ohio.

139.    On December 12, 2023, agents conducted electronic and physical surveillance of Anglemyer. At approximately 8:00 a.m., Anglemyer departed **TARGET LOCATION 1** and drove to **TARGET LOCATION 2**. Anglemyer departed **TARGET LOCATION 2** at approximately 9:12 a.m. and stopped at **Mill Run Road** at approximately 9:36 a.m. Investigators have learned that Sodaro and/or Anglemyer rent a storage unit at this location. Anglemyer drove to the Ashville Post Office after departing the storage facility. Investigators discovered that Anglemyer shipped 2 priority mail parcels from the Ashville, Ohio Post Office using a return address of "███████████████████████████." A check of open-source and law enforcement indices revealed this address to be a viable address, but no one named ███████ is associated with the address. The shipping was paid for with cash. Agents confirmed with postal employees that a male subject had shipped these 2 packages. As previously stated, in my training and experience, it is common for drug traffickers to utilize fictitious names and/or make payments in cash to avoid detection from law enforcement.

140.    On January 4, 2024, electronic surveillance revealed Sodaro and Anglemyer exiting **TARGET LOCATION 2** at approximately 3:20 p.m. Sodaro appeared to be carrying at least one US Priority Mail package. Sodaro was observed entering the driver's side of her 2020 Rogue while Anglemyer entered the passenger's side. The vehicle departed the area.

141.    Records from USPIS revealed that on January 4, 2024, at approximately 3:28 p.m., 2 US Priority Mail packages had been mailed from the Post Office in Waverly, Ohio. The return address listed on both packages was ████████████████████████████. The postage was paid with cash.

142.    Through the use of open-source and law enforcement indices, investigators were unable to locate a ████████ associated with ████████████████. Based on prior

experience, your affiant knows that drug traffickers use false and/or misleading information such as names and/or addresses on packages containing controlled substances in an attempt to conceal their true identity from law enforcement.

143.    The 2 packages were addressed as follows:



Tracking #9505513945974004811646          Tracking #9505513945974004811660

144.    Information from USPIS developed during the course of this investigation documented an additional 5 US Priority Mail Packages mailed from the Post Office in Waverly, Ohio to the address of ███████████████████████. The previous packages were addressed to Tyler Gilgard. The return address on the packages was P.O. Box 186, Waverly, Ohio 45690. Agents know that this is the P.O. Box rented by Anglemyer on June 3, 2020. When he rented this P.O. Box, Anglemyer listed his address as the **Market St. Apartment**. The documented US Priority Mail packages are listed below:

| DATE | TRACKING # | Method of Payment |
|------|-----------|-------------------|
| 06/03/2021 | 9505513945971154448517 | Visa 0310 |
| 07/08/2021 | 9505513945971187459399 | Visa 0310 |
| 07/12/2021 | 9505513945971193461676 | Cash |
| 07/30/2021 | 9505513945971211467703 | Cash |
| 10/26/2021 | 9505513945971299499788 | MC 1856 |

145.    Through Grand Jury subpoenas requesting bank information, investigators learned that Visa 0310 was a Visa debit/credit card connected to the US Bank checking account ███████████ belonging to Tanner Morris. I have reason to believe that one of Morris's roles in the Anglemyer DTO was to prepare and mail out steroids packaged in US Priority Mail boxes to customers.

146.    Investigators further received evidence that MC 1856 was a MasterCard debit/credit card connected to the Fifth Third Bank personal checking account ███████ belonging to Mark Anglemyer.

147.    Based on the information provided above, your affiant has reason to believe that ███ ███████ is a steroid customer of the Anglemyer DTO and that the US Priority Mail packages that were mailed by Arin Sodaro on January 4, 2024, that originated from her residence at **TARGET LOCATION 2** contained steroids.

148.    On January 5, 2024, at approximately 2:39 p.m., electronic surveillance revealed that Anglemyer drove his Ram truck from **TARGET LOCATION 1** to **TARGET LOCATION 2**. Approximately 45 minutes later, Sodaro drove the truck to Walmart and returned to her residence, **TARGET LOCATION 2**. Sodaro was the only occupant in the truck. Sodaro was observed exiting the vehicle and carrying a plastic shopping bag. At approximately 3:58 p.m., Sodaro and Anglemyer exited **TARGET LOCATION 2** and entered the Ram truck. Anglemyer carried 3 US Priority Mail packages from the residence, placed them inside the truck, and departed. The vehicle traveled from **TARGET LOCATION 2** to the Post Office located at 125 E. Second Street. Upon departing the Post Office, Anglemyer and Sodaro arrived at **TARGET LOCATION 1**.

149.    Records from USPIS revealed that on January 5, 2024 at 4:02 p.m. and 4:03 p.m., 3 US Priority Mail Packages were mailed from the Post Office in Waverly. The return address listed on all 3 packages was, █████████████████████ Through the use of open-source and law enforcement indicies, investigators were unable to locate an ███ ███████ associated with the address of ███████████████████.

150.    Based on the information provided above, your affiant has probable cause to believe that Mark Anglemyer prepared the packages for shipment at **TARGET LOCATION 2**, took them to the Post Office in Waverly, and mailed them. Your affiant has further probable cause to believe the 3 US Priority Mail packages mailed by Anglemyer contained steroids and/or other narcotics.

151.    On February 20, 2024, Anglemyer's Ram truck departed **TARGET LOCATION 1** and parked at **TARGET LOCATION 2** at approximately 8:12 a.m. At approximately 10:00 a.m., Sodaro exited her residence with a number of US Priority Mail packages which she placed in the back seat of the truck. Sodaro entered the driver's door and departed **TARGET LOCATION 2.** Sodaro drove the truck to the Post Office located at 125 E. Second Street and remained at that location for approximately 3 ½ minutes before departing again. Sodaro drove the truck to **TARGET LOCATION 1**.

152.    Information from USPIS revealed there were 6 parcels mailed out at that time. All were paid for with cash. The return address listed on all 6 packages was ███████████████ ███████████████. According to open source and law enforcement indices checked, ███████. is not a viable address; nor is there a person identified as ███████████████ ███████. There were 4 small flat-rate boxes and 2 medium flat-rate boxes. The packages were mailed to the following addresses:



153.    The Anglemyer DTO has sent a total of 81 packages from August 24, 2020 to February 20, 2024, to a customer named ███████████ at his previous address of ███████████., and his current address of ███████████████████. The senders'

names were listed as ███████████, Tanner Morris, Thomas Shelby, ███████████, ███, ███████████████████████, or blank. ███████████████ Tanner Morris, and Thomas Shelby are all names that have previously been used by the Anglemyer DTO when mailing steroids to customers. More recently, members of the DTO have been using fictitious names to disguise the real sender and avoid detection by law enforcement. According to open source and law enforcement indices checked, there are no persons identified as ███████████, ███████████████████ in Pike County, Ohio. Return addresses included PO Box 186, 201 Cherry Street, **TARGET LOCATION 1**, ███████████████████ or left blank. The PO Box and **TARGET LOCATION 1** are both addresses directly connected to Anglemyer. 201 Cherry Street is Tanner Morris' previous address. The remaining addresses were checked in open source and law enforcement indices; the remaining addresses are not viable addresses. Investigators found one ███████████, 78 years old, in Lucasville, Ohio; not at all associated with any of the addresses listed.

154.    Records received from Facebook Messenger contained messages between ███████████ and Anglemyer on December 21, 2022, regarding orders that ███████ had sent to Anglemyer. Anglemyer requested that ███████ resend the orders because Anglemyer 's phone went out. Records received from Venmo indicated there have been 40 payments from ███████ to Anglemyer between February 14, 2020, and March 8, 2022, totaling $24,775.00. Sixteen payments coincide with USPS packages mailed to ███████ either on the same day or the following day.

155.    Investigators were able to determine the package mailed out of February 20, 2024, to ███ ███████████████████ is the residence of a subject named ███████████. ███████ was a prior recipient of at least 2 other US Priority Mail Packages mailed from the

Anglemyer DTO on 03/21/2023 and 6/24/2023. The return address on those packages was PO Box 186, Waverly, OH 45690; this PO Box is connected to Anglemyer's **Market St Apartment.**

156.    On February 22, 2024, at approximately 10:05 a.m., electronic surveillance revealed Anglemyer drove his Ram truck from **TARGET LOCATION 1** to **TARGET LOCATION 2**. Anglemyer proceeded to remove items from the bed of the truck and put them under the carport. Sodaro exited the residence carrying a large shoulder bag. Sodaro placed the bag into the back passenger compartment of the truck. Sodaro then assisted Anglemyer with removing items from the truck bed. Once finished, Anglemyer climbed into the driver's seat, Sodaro entered the passenger seat and they departed **TARGET LOCATION 2**. At approximately 10:16 a.m., Anglemyer and Sodaro arrived at the Post Office in Waverly.

157.    USPIS records revealed one package was mailed out at approximately 10:17 a.m., weighing 6 oz., with postage of $10.40. The return address was listed as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. The recipient was listed as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮., ▮▮▮▮▮▮▮▮▮▮▮▮▮. As previously stated, open source and law enforcement indices were checked, and ▮▮▮▮▮▮. is not a viable address, nor is there any person named ▮▮▮▮ ▮▮▮ in Pike County, Ohio.

158.    On March 1, 2024, at approximately 2:45 p.m., Sodaro drove Anglemyer's Ram truck from **TARGET LOCATION 1** to **TARGET LOCATION 2**. Sodaro went inside her residence after picking up packages that had been left on her porch. At approximately 3:49 p.m., UPS delivered a small box to the porch.

159.    At approximately 3:51 p.m., Sodaro and 2 children exited **TARGET LOCATION 2** and climbed into the truck. Sodaro was carrying packages that appeared to be US Priority Mail boxes. Sodaro departed from her residence and arrived at the Post Office in Waverly, Ohio at

approximately 3:55 p.m. The truck remained parked at that location for approximately 5 minutes.

Sodaro departed, and went to a strip mall in Waverly before returning to Sodaro 's residence at

approximately 4:27 p.m.

160.    Information received from USPIS revealed Sodaro mailed out 3 packages on March 1,

2024. The packages were mailed to the following addresses:



161.    Investigators identified 5 other packages mailed to ████████████████████.

The packages were addressed to ████████████. Four of the packages listed the return address

as PO Box 186, Waverly, OH 45690 with no name. The postage was paid using a Visa 0310, MC

8112, or cash. The remaining package, mailed out on March 29, 2022, by Anglemyer, was

seized. The package, previously described in this affidavit, contained several bottles and vials of

steroids.

162.    On March 7, 2024, at approximately 4:06 p.m., Anglemyer was observed exiting

**TARGET LOCATION 2** and walking to the side of the house out of view. At approximately

4:10 p.m., Sodaro exited **TARGET LOCATION 2** carrying packages and joined Anglemyer at

the side of the house. At approximately 4:11 p.m., Sodaro carried the packages to Anglemyer's

Ram truck parked in the driveway, placed the packages into the back seat, climbed into the

driver's seat, and departed. Anglemyer also departed the residence on his motorcycle. Sodaro

arrived at the Post Office in Waverly at approximately 4:15 p.m and remained at that location for

approximately 6 minutes.

163.    Records from USPIS revealed 2 US Priority Mail Packages had been mailed from the

Post Office in Waverly, OH 45690 between 4:17 PM and 4:18 PM. The return address on the

packages stated "No Label" and recipient names were also not provided. The shipping was paid for with cash. Anglemyer keeps bags of cash at **TARGET LOCATION 1**, presumably proceeds from drug trafficking. The packages were mailed as follows:



- ███████████████ – 4 oz.
- ███████████████████ – 7 lbs. 13 oz.

164.    Investigators identified 6 other packages mailed to ██████████████████ between 5/12/23 and 1/16/24. Shipping was paid for using Visa 6260, cash, or Visa 9018. The packages were addressed to ███████████. The senders' names on the packages were listed as



████████████████████████ or left blank. The return address used was ███

█████████████████████████. PO Box 186 is leased by Anglemyer, all other return addresses are not viable addresses, nor do any of the senders exist in Pike County, Ohio. Based on the foregoing information, agents have probable cause to believe that ████████████ is a customer of the Anglemyer DTO.

165.    On March 8, 2024, at approximately 9:35 a.m., Anglemyer's Ram truck departed **TARGET LOCATION 1**, made a stop at a coffee shop, and arrived at **TARGET LOCATION 2** at approximately 9:48 a.m. At approximately 12:29 p.m., Sodaro was observed exiting **TARGET LOCATION 2** carrying several packages to the Ram truck parked in the driveway. Sodaro placed the packages in the back seat, climbed into the driver's seat and departed at approximately 12:30 p.m. Sodaro arrived at the Post Office in Waverly at approximately 12:39 p.m. and remained at that location for approximately 18 minutes.

166.    Records from USPIS revealed there were 6 US Priority Mail packages mailed from the Post Office in Waverly. The records reported "No Label" for the return address and/or the name of the recipient. The postage was paid in cash. As previously noted in this affidavit, Anglemyer keeps bags of cash at **TARGET LOCATION 1**, presumably proceeds from drug trafficking,

and Sodaro was at **TARGET LOCATION 1** earlier in the day. However, the packages were

mailed as follows:



- ██████████████████████ – 11 oz.
- ██████████████████████ – 7 oz.
- ███████████████ – 7 oz.
- ██████████████ – 5 oz.
- ███████████████ – 7 oz.
- ████████████████████ – 3 oz.

167.    Investigators identified 16 other packages mailed to ████████████████,

████████████████ between January 27, 2021 and December 30, 2023. The packages were

addressed to ████████████████████████, or left blank. The senders' names on

the packages were listed as Thomas Shelby, ████████████, or left blank. Return addresses

included **TARGET LOCATION 1.**, PO Box 186, ████████████., or left blank. Agents know

Thomas Shelby to be an alias used by the Anglemyer DTO to mail packages in the past. The

return address 418 Hillside Dr. (**TARGET LOCATION 1**) and PO Box 186 both belong to

Anglemyer, and as previously noted in this affidavit, ████████████. is a fictitious address and

████████████ is a fictitious name. Based on my experience and knowledge of this

investigation, I know drug traffickers often use fictitious names and addresses when mailing

illegal substances to avoid detection from law enforcement. Based on the foregoing information,

there is probable cause to believe the recipient located at ████████████████████,

████████ is a customer of the Anglemyer DTO purchasing steroids.

168.    Investigators identified 19 other packages mailed to ████████████████████

76135 between February 8, 2022 and December 30, 2023. The packages were addressed to

████████████. The senders' names on the packages were listed as ████████████████, or

left blank. Return addresses included PO Box 186, ████████████████████████

████████████████. is a viable address, but there is no ████████ associated with the address.

The other addresses have been identified as Anglemyer's PO Box or a fictitious address that has previously been used by the Anglemyer DTO to send packages. Based on my experience and knowledge of this investigation, I know drug traffickers often use fictitious names and addresses when mailing illegal substances to avoid detection from law enforcement. Based on the foregoing information, there is probable cause to believe that Thorne Penrod, located at █████ ██████████████████████, is a customer of the Anglemyer DTO purchasing steroids.

169.    The address ██████████████████, with the recipient identified as ████████ ██████, was previously addressed in this affidavit as a customer of the Anglemyer DTO.

170.    On March 11, 2024, at approximately 4:06 p.m., Anglemyer and Sodaro were observed exiting **TARGET LOCATION 2**. Anglemyer was carrying at least 2 packages. Anglemyer climbed into the passenger side of the Ram truck with the packages while Sodaro entered the driver's seat. They departed **TARGET LOCATION 2** and arrived at the Post Office in Waverly at approximately 4:11 p.m. They remained at the Post Office for approximately 8 minutes. When they departed from the Post Office, Sodaro and Anglemyer drove to **TARGET LOCATION 1**. At approximately 4:28 p.m., the truck departed **TARGET LOCATION 1** and arrived at the old high school parking lot at approximately 4:30 p.m. Agents know this location to be a common place for the Anglemyer DTO to conduct drug transactions. The truck then arrived at **TARGET LOCATION 2** at approximately 4:38 p.m.

171.    Records from USPIS revealed that 2 US Priority Mail packages were mailed out with the return address of ████████████████████████████. Open source and law enforcement indices were checked, and ████████████████████████ is not a viable address, nor is there a ████████████ in Pike County, Ohio. The 2 packages were mailed out as follows:

- ████████████████████████████ – 9 oz.
- ████████████████████████████ 2 lbs. 1 oz.

172.    On March 12, 2024, at approximately 1:26 p.m., Sodaro was observed exiting **TARGET LOCATION 2** carrying packages to the Ram truck parked in the driveway. Sodaro entered the driver's seat and departed. Sodaro drove to **TARGET LOCATION 1**, arriving at approximately 1:28 p.m. Sodaro was at **TARGET LOCATION 1** for approximately 8 minutes. At approximately 1:36 p.m., the truck departed Anglemyer's residence and arrived at the Post Office in Waverly at approximately 1:38 p.m. and remained there for approximately 6 minutes.

173.    Records from USPIS revealed there were 2 US Priority Mail packages shipped out at approximately 1:40 p.m. The return address listed on both packages was ████████████ ██████████████████████. As previously noted in this affidavit, ████████████., ████████████████ is not a viable address. Furthermore, there is no ████████████ in Pike County, Ohio. The 2 packages were mailed as follows:

- ████████████████████████████ – 5 oz.
- ████████████████████████████ – 5 oz.

174.    On April 15, 2024, electronic surveillance at **TARGET LOCATION 2** indicated at approximately 9:33 a.m., Sodaro exited **TARGET LOCATION 2** carrying packages out to a 2019 Volkswagen Tiguan, black in color, climbed inside, and departed.

175.    According to information received from USPIS, 3 packages were mailed in the same transaction at the Waverly Post Office between 9:39 a.m. and 9:41 a.m. The return address was listed as ████████████████████████████. The postage was paid in cash.

176.    Through the use of open-source and law enforcement indices, investigators were unable to locate a ████████████ associated with ████████████████████. Open-source and law enforcement indices revealed the address of ████████████████ is not a viable address.

Based on prior experience, your affiant knows that drug traffickers use false and/or misleading information such as names and/or addresses on packages containing controlled substances in an attempt to conceal their true identity. As previously mentioned in this affidavit, Sodaro utilized return address information of ████████████████████████████████████, on January 4, 2024.

177.    The packages mailed out on April 15, 2024 were as follows:

- ████████████████████████████████████. ████████ has been identified as a steroid customer of the Anglemyer DTO. As noted previously, agents have documented at least 7 other packages mailed to ████████████ at this address.

- ████████████████████████████████████. USPIS records revealed there was at least one other package from the Anglemyer DTO delivered to this address on December 30, 2023. The return address was ████████████████████████████████████████.

- ████████████████████████████████. The recipient's name appears to be ████████ This address may be a business park address.

178.    On May 1, 2024, electronic surveillance on Sodaro revealed she departed **TARGET LOCATION 2** in her Volkswagen Tiguan at approximately 9:23 a.m. carrying a large, square shopping bag with handles. Sodaro returned to **TARGET LOCATION 2** at approximately 10:19 a.m. Information received from USPIS revealed 3 packages were mailed out during the time Sodaro was at the Post Office. The return address for all 3 packages was ████████████ ████████████████████████████. Open-source and law enforcement indices revealed the address of ████████████████████████ is not a viable address, and there is no person named ████████████ n Pike County, Ohio. The postage was paid for in cash. The packages were mailed as follows:

- ████████████████████████████████
- ████████████████████████████
- ████████████████████████████

179.    This is the 18th package shipped to ████████████████████████████.
Shipping history for this address was explained previously in this affidavit.

180.    At approximately 10:19 a.m., Sodaro returned to **TARGET LOCATION 2**. Electronic surveillance revealed Sodaro exited the driver's seat and opened the back passenger door to retrieve something before entering the residence. Shortly thereafter, Sodaro exited **TARGET LOCATION 2** and departed in the Volkswagen Tiguan toward Hillside Avenue. Electronic surveillance at Hillside indicated that Sodaro arrived at **TARGET LOCATION 1** at approximately 10:22 a.m.

181.    At approximately 10:35 a.m., Sodaro and Anglemyer returned to **TARGET LOCATION 2** in the Volkswagen Tiguan. Both exited the vehicle. Sodaro entered the residence, while Anglemyer stood on the front porch and looked around. It appeared he was checking to see if they were followed. He then went inside.

182.    At approximately 3:20 p.m., Sodaro exited the residence carrying at least one package and entered the Volkswagen Tiguan. Information from USPIS revealed 2 more packages were mailed out. The return address on both packages was ████████████████████████ ████████████████. Open-source and law enforcement indices revealed the address of ████ ████████████████████ is not a viable address, and there is no person named ████████ ████████ in Pike County, Ohio. The postage was paid for in cash. Agents know that Anglemyer maintains bags of cash at **TARGET LOCATION 1**, presumably proceeds from drug trafficking, and as previously noted, Anglemyer and Sodaro were recently at **TARGET LOCATION 1**. The packages were mailed as follows:

- ██████████████████████████. USPIS records revealed there was at least one other package from the Anglemyer DTO shipped to this address on January 5, 2024. The return address was blank, but postage was paid with

Visa ending in 2791. This card is connected to Anglemyer's CashApp account.

- ██████████████████████████ USPIS records revealed there was at least one other package from the Anglemyer DTO shipped to ████ ████████ at this address on December 2, 2023. The return address was listed as ███████████. Postage was paid with Visa ending in 2791. This card is connected to Anglemyer's CashApp account. Open-source and law enforcement indices revealed the address of ████████████████████ is a fictitious address, and there is no person named ████████ in Waverly, Ohio.

183.    On May 6, 2024, electronic surveillance at **TARGET LOCATIONS** revealed Sodaro departed **TARGET LOCATION 2** in her Volkswagen Tiguan and arrived at **TARGET LOCATION 1** at approximately 7:05 a.m. Sodaro returned to **TARGET LOCATION 2** at approximately 7:13 a.m. At approximately 3:57 p.m., Sodaro exited **TARGET LOCATION 2** carrying what appeared to be US Priority Mail packages/boxes to her black SUV. The packages were placed in the front seat as she climbed into the vehicle. Sodaro departed **TARGET LOCATION 2** at approximately 3:58 p.m. Sodaro returned to **TARGET LOCATION 2** at approximately 4:11 p.m.

184.    USPIS records revealed one package was mailed out between 3:57 p.m. and 4:11 p.m. The postage was paid with cash. Investigators believe the cash was obtained from **TARGET LOCATION 1**. Return address information was not available. The package was mailed to ████. ██████████████████████

185.    On May 14, 2024, surveillance was established in Waverly, Ohio. Anglemyer's truck and Sodaro's Volkswagen Tiguan were observed at **TARGET LOCATION 2**. Surveillance agents were notified when Sodaro was observed via electronic surveillance exiting **TARGET LOCATION 2** with a reusable tote bag that appeared to be full. Agents have previously

observed Sodaro using a tote bag to carry postal packages. Sodaro placed the tote bag into her black SUV and climbed in. At approximately 11:48 a.m., Sodaro departed **TARGET LOCATION 2**.

186.    Surveillance agents followed loosely and headed to the area of the Waverly Post Office. At approximately 11:55 a.m., Sodaro was observed exiting the Waverly Post Office with an empty tote bag. Sodaro climbed into her Volkswagen Tiguan and returned to **TARGET LOCATION 2**.

187.    USPIS records revealed SODARO had mailed out 7 parcels, all paid for with cash. The return address used on the packages was ████████████████████████████.

Open source and law enforcement indices were checked for the return address information. The address ██████████ is a fictitious address, and there is no █████████ in Waverly, Ohio. The packages were mailed to the following:

- ██████████████████████. This address is associated with ██████████, a previously identified steroid customer of ANGLEMYER's. USPIS records show there have been been 81 other packages shipped from members of the ANGLEMYER DTO to ██████████ at this address and his previous address. Investigators have Facebook messages between ANGLEMYER and ██████ regarding orders for steroids. Records from Venmo indicate at least 40 payments have been made from ██████ to ANGLEMYER totaling $24,775.00. 16 payments coincide with USPS packages mailed from Waverly, Ohio to ██████ either on the same day or the following day.

- ████████████████████████.

- ██████████████████████. This address is associated with ████████, a previously identified steroid customer of ANGLEMYER's. USPIS records revealed there have been 8 other packages shipped from members of the ANGLEMYER DTO to ██████████ at this address.

- ██████████████████████. This address is associated with ██████████, a previously identified steroid customer of ANGLEMYER's. USPIS records revealed there have been 3 other packages shipped from members of the ANGLEMYER DTO to ██████████ at this address.

- ███████ ███████████████████████████, associated with ████████████, a previously identified steroid customer of ANGLEMYER's. According to open source and law enforcement indices, there is no person named ██████████ associated with this address. USPIS records revealed there have been 20 other packages shipped from members of the ANGLEMYER DTO to ██████████ at this address.

- ████████████████████████████████████████████. This is the second package shipped from the ANGLEMYER DTO to █████████ at this address.

- ████████████████████████████████. USPIS records show there has been one other package shipped to this address from the ANGLEMYER DTO.

188.    USPIS has identified approximately 2,453 packages as having been mailed by Anglemyer or another identified member of his DTO between October 1, 2019 and July 31, 2023. An additional 48 packages have been identified on an "as needed" basis from surveillance activities between December 2, 2023 and February 24, 2024. In addition to the information already provided, your affiant learned or observed the following about said packages:

a.    Between August 3, 2020 and September 23, 2021, 110 Priority Mail packages were shipped using Morris' name and his previous address of 201 Cherry Street, Waverly, Ohio on the return label. These shipments were paid for using a Visa ending in 1911, or a Visa ending in 0310. These 2 Visa credit cards were used previously to ship steroids to the USPIS CI in Arizona.

b.    Between August 6, 2020 and February 2, 2021, 40 Priority Mail packages were shipped by members of the Anglemyer DTO using the return address of SPC Services, LLC, PO Box 186, Waverly, OH 45690. SPC Services, LLC also used **TARGET LOCATION 1** as the return address on 17 other Priority Mail packages sent between October 2, 2020 and January 4, 2021. Anglemyer's Mastercard ending in 4960, the same

card used to purchase the pill press, was used to pay for shipping 29 of the packages using SPC Services, LLC as the sender.

c.       Between August 18, 2020 and January 19, 2021, ███████████████ name was used to ship 9 packages from Morris' previous address on Cherry Street and 1808 Deer Crossing Drive, Marysville, Ohio, identified as Shelton's previous address from law enforcement indices. Based on surveillance, your affiant knows that ██████ and Morris moved to Columbus, Ohio. The shipments were paid for using ██████ credit card and a credit card connected to Anglemyer's bank account.

d.       Between October 1, 2020 and October 14, 2021, Anglemyer's name and all 3 addresses, **TARGET LOCATION 1**, the **Market St. Apartment**, and PO Box 186, Waverly, Ohio 45690, were used as the return address on 6 different shipments. One package was paid for using a Visa ending in 1911, which is connected to Morris' US Bank account, and was used to pay for shipping steroids to the Arizona CI.

e.       Between October 8, 2020 and March 8, 2021, 459 Priority Mail packages were shipped with the return address of "Thomas Shelby" at **TARGET LOCATION 1**. Agents know "Thomas Shelby" is an alias used by Tanner Morris.

f.       Between March 9, 2021 and October 11, 2022, 1,086 Priority Mail parcels were shipped by members of the Anglemyer DTO using the return address of PO Box 186, Waverly, Ohio 45690.

g.       Between April 15, 2022 and September 30, 2022, a total of 161 packages were shipped from the Wellston, Ohio Post Office, approximately 45 minutes away from Waverly, Ohio. 142 packages used PO Box 186, Waverly, Ohio as the return address; 2 packages listed 516 West A Street, Wellston, Ohio as the return address; and 17 packages

were shipped with a blank return address. Agents have determined that Blake Mankin previously lived at of 516 West A Street, Wellston, Ohio 45962.

189.    The shipping for all 2,453 packages was paid for using 15 different credit/debit cards or cash. All 15 cards have been identified as belonging to members of the Anglemyer DTO to include Anglemyer, Howell, Mankin, Morris, and ███████.

### Financial Investigation

190.    Bank records from Fifth Third Bank revealed Anglemyer, with a listed address of **TARGET LOCATION 1**, has a checking account ███████ that he opened on June 26, 2017. Anglemyer is listed as the sole owner of the account. At the time the account was opened Anglemyer listed his employer as Adena Health.

191.    The bank records for the Fifth Third checking account ███████ revealed that Anglemyer used this account to purchase the pill press from LFA in March 2021. The purchase was made with a Mastercard ending in 4960 that was tied to the account.

192.    Further review of the Fifth Third checking account ███████ revealed Anglemyer had used this account to pay for the mailing of US Priority Mail Packages in 2020, 2021, and 2022.

193.    Based on debits listed for his Fifth Third checking account ███████, Anglemyer made purchases that would be consistent with his narcotics operation from:

- Med Lab Supply
- Med Lab Gear
- GPZ Services / GZP Med Lab
- Premium Vials

194.    A review of Anglemyer's Fifth Third Bank account ███████ revealed that beginning on April 27, 2020, Anglemyer began to utilize the payment platform Cash App to send money from his Fifth Third Bank account to a subject named "Tanner," and in August 2020,

Anglemyer used Cash App to exchange money with a subject named █████████ ” Investigators believe "Tanner" is Tanner A. Morris and that █████████ ” █████████████████████, ████████████████. The records show that Anglemyer made numerous Cash App exchanges with "Tanner" between April 2020 and December 2020.

195.     During the time period between October 1, 2019 and April 7, 2022, deposits made to Anglemyer's Fifth Third account, ████████, consisted primarily of funds received via PayPal, Cash App, and Venmo. I know, based on my training and experience, that drug traffickers use these types of applications to receive payments from their customers in an attempt to conceal a hand-to-hand payment and that these applications are utilized using a cellular telephone or a computer. Deposits of US currency were also made to the Fifth Third account as well as interfund transfers from Account # ████████, which is a Fifth Third Bank joint checking account established on January 19, 2013 in the names of Mark and █████ ████████████████████.

196.     In addition to the cash deposits and account transfers documented above in this affidavit, agents have found the following text conversations and corresponding financial transactions.

- On June 29, 2023, Sodaro asked ██████ if she could transfer funds into Anglemyer's Fifth Third Bank personal checking account ending in 5052 to cover the cost of Anglemyer's glasses. On June 29, 2023, a transfer was made from Mark and ████████████████ Fifth Third Bank joint checking account ending in 0843 to Anglemyer's Fifth Third Bank personal checking account ending in 5052 for $1,500. Also on June 29, 2023, a debit/charge was made to the account by Lenscrafters in Lancaster, Ohio in the amount of $793.59. The following text conversation occurred between Sodaro and ██████ :

Sodaro:  Thank you. I'll pull out of the bag for you [at **TARGET LOCATION 1**]

████:  You can just deposit [cash] into his account and I'll take it back

Sodaro:  Okay!

Sodaro:  His lenses were so expensive

████:  Yeah I'd say so

- On July 3, 2023, Sodaro and ████ had the following text conversation:

  ████:  I transferred my $1500 back into my account

  ████  He's left with $2,632

  Sodaro:  Okay, that should be plenty to pay his bills for the week and book the

  trip [to Colombia].

On July 3, 2023, $1,500 was transferred from Anglemyer's Fifth Third Bank personal checking account ending in 5052 to Mark and ████████ Fifth Third Bank joint checking account ending in 0843.

197.    As of October 16, 2020, the Fifth Third account ████████ has been used to make weekly payments to Ohio Valley Bank of $338.97. In August 2020, Anglemyer purchased a 2020 Ram truck from Hernstein Chrysler Jeep Ram in Chillicothe, Ohio for $86,302.00. The purchase of the truck was financed through Ohio Valley Bank. The Ohio Bureau of Motor Vehicles disclosed that on or about September 29, 2020, Anglemyer registered the vehicle using **TARGET LOCATION 1**. This is the same vehicle surveillance has observed Anglemyer use on numerous occasions to transport packages, including packages containing controlled substances, to the Post Office in Waverly, Ohio.

198.    The Ohio Bureau of Motor Vehicles disclosed that on April 24, 2021, Mark Anglemyer purchased a 2016 Equinox and registered the vehicle using the address of the **Market St.**

**Apartment**. This is the same vehicle surveillance has observed Howell use on several occasions to transport packages, including packages containing controlled substances, to the Post Office in Waverly, Ohio.

199.    According to the loan application for the purchase of the Equinox, dated April 24, 2021, Anglemyer entered into an agreement with the Nourse Chillicothe Automobile for a total purchase price of $19,120.38. The entire purchase price of the vehicle was financed through Park National Bank. Anglemyer is paying $317.16 per month for the loan payment on the Equinox. Anglemyer reported he was living at the **Market St. Apartment** for the past year and 6 months with a monthly rent of $325.00. Anglemyer listed his prior address as **TARGET LOCATION 1** and stated he was the owner of Anglemyer Legacy Marketing with a salary of $5,500 per month ($66,000 per year). Legacy Marketing, LLC was formed by Anglemyer on December 12, 2017, however, investigators have not been able to locate any financial information within Anglemyer's banking records for this company.

200.    Investigators discovered that on April 8, 2020, Mark A. Anglemyer received $20,000 in cash from a negotiable instrument that he cashed in at the Fifth Third Bank located at 128 W. Main Street, Chillicothe, Ohio 45601.

201.    On August 28, 2020 Mark A. Anglemyer withdrew $13,000 in cash from bank account ▮▮▮▮▮▮ with Fifth Third Bank. According to the Currency Transaction Report filed by Fifth Third Bank on the transaction, Anglemyer listed his occupation/Type of Business as "HANDYMAN."

202.    On August 3, 2021, Mark A. Anglemyer received $11,000 in cash from a negotiable instrument that he cashed in at the Fifth Third Bank located at 10551 Route 23, Lucasville, Ohio 45648.

203.    Records received from Atomic Credit Union disclosed that on April 27, 2021 Mark A. Anglemyer, Jr. established a checking and savings account as Member #███████. On the membership application/agreement he listed his occupation/employment as "Self-Employed." This account, like the Fifth Third Bank Account ███████, received deposits from Venmo, Square, Cash App, Pay Pal, as well as deposits of US currency during the time period of April 28, 2021 to October 9, 2022. I know, based on my training and experience that drug traffickers use these types of platforms to receive payments from their customers on their cell phones in an attempt to conceal a hand-to-hand payment.

204.    From April 2021 through December 2021, Anglemyer deposited approximately $31,303.16 into the Atomic Credit Union #███████ checking account.

205.    Records from the State of Ohio Department of Taxation revealed that for the tax years 2017 through 2020 Mark Anglemyer and ███████████ filed joint tax returns and had Federal Adjusted Gross Incomes of:

- 2017      $88,299.00
- 2018      $66,162.00
- 2019      $47,141.00
- 2020      $54,894.00
- 2021      $57,748.00

206.    In 2017, Mark Anglemyer had IRS Form W-2 wages of $35,833.00 from Adena Health System. In 2018 Mark Anglemyer had multiple IRS Form W-2s indicating wages from Coughlin Auto Group ($66.00), Adena Health System ($2,680), and Paccar Inc. ($1,219.00), in addition to IRS Forms 1099-R from Valic Retirement Services ($12,184) for a total reportable income of $16,149. In 2019, Mark Anglemyer had no reportable income and the only income reported was from ███████████ W2 wages of $47,652 from Mid-American Conversion Services. In 2020, Mark Anglemyer had no reportable income; ███████████ had W-2 wages of

$67,917.00 and their 2020 Federal adjusted gross income was reported as $54,894.00. In 2021, Mark Anglemyer had no reportable income; ██████████ had W-2 wages of $89,391 and their reported Federal adjusted gross income was $57,748, which included a "Business Loss" of $24,426 as reported on IRS Form Schedule-C.

207.    From mid-2021 to present day, investigators have not observed Anglemyer to be gainfully employed. Anglemyer had a food truck when law enforcement initiated the local investigation in April of 2021, however, agents never observed the food truck in operation during any surveillance. Anglemyer sold the food truck in July 2021 and was planning to establish a permanent location for a restaurant. However, on August 17, 2022, Anglemyer posted on his Facebook page that he does not plan to open the restaurant. Yet, a review of total annual deposits made into Fifth Third account ██████████, solely owned by Mark Anglemyer, via PayPal, Cash App, Venmo, cash/currency and interfund-transfers revealed the following unexplained income/deposits:

- **2020** - $ **217,906** (These deposits were not reflected as reported income on 2020 taxes)
- **2021** - $ **219,926** (These deposits were not reflected as reported income on 2021 taxes)
- **2022** - $**55,767** (through January, February & March)

208.    Records revealed that in 2021, Anglemyer paid approximately $16,271 on the Ram truck and $2,537 on the Chevy Equinox, totaling $18,808. Per the loan application for the Equinox, Anglemyer indicated he was living at the **Market St. Apartment** and paying monthly rent of $325, or $3,900 per year. These cash outflows do not include daily/monthly cost of living expenditures like food, utilities, travel, credit card payments, maintenance costs, insurance costs, cellular telephone costs, gas costs and/or mortgage costs. Just the annual cash outflows for the 2 vehicles and the apartment rental, totaling $22,708 per year exceeds Anglemyer's "reported

income" of zero ($0.00) dollars during the tax year of 2021, and/or a business operating loss of $24,426 as reported on his state tax returns.

209.    I know from my training and experience that drug traffickers will deposit proceeds derived from the sale of narcotics into bank accounts to operate their illegal business, pay monthly expenses to include but not limited to car payments, rent payments, utilities, insurance, travel, and/or co-mingle funds in an attempt to legitimize ill-gotten gains.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

210.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **TARGET LOCATIONS**, in whatever form they are found. One form in which the records might be found is data stored on a cellular telephone, on a computer's hard drive or on other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

211.    *Probable cause.*  I submit that if a cellular telephone, a computer or a storage medium is found on the **TARGET LOCATIONS**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the

data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

212.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET LOCATIONS** because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and

malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or

consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.  I know from my training and experience that cellular telephones and computers may be important to criminal investigations in 2 distinct ways: (1) such devices may themselves be evidence, instrumentalities, or fruits of crime, and/or (2) such devices

may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. In this investigation, cellular phones and/or computers are instrumentalities of the crimes because they were used as a means of committing the criminal offenses. That is, including but not limited to receiving renumeration for the sale of illegal steroids through various digital payment applications, and operating as a platform for the purchase of illegal steroids using the Internet. Such devices are also likely to be a storage medium for evidence of such crimes. From my training and experience, I believe that cellular telephones and computers used to commit a crime of this type may contain data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

213.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.    *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it

requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  *Technical requirements*.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

214.  *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire

medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

215.     Based on my training, experience, and my knowledge of this investigation I know that individuals engaged in the illegal distribution of drugs often use not only places where they reside, but other locations, to store, prepare, and sell drugs, and the proceeds thereof. Organizations such as the Anglemyer DTO commonly maintain records of their business in paper or electronic formats. These records are commonly found either on the members of the organization or in the locations where they are staying.

<u>**CONCLUSION**</u>

216.     Based upon the foregoing, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

STACIE MODESITT SCHMIDT
Digitally signed by STACIE MODESITT SCHMIDT
Date: 2024.06.03 10:38:43 -04'00'

Stacie Modesitt Schmidt, Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me
this _____4th_____ day of June, 2024.

Honorable Chelsey M. Vascura
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT "A" – PLACE TO BE SEARCHED**

The place to be searched is the premises known as 418 Hillside Avenue, Waverly, Ohio 45690.

The premises includes a two-story building with blue vinyl siding.  It is located on the west side of the street, halfway down, and across from Linden Avenue in Waverly, Ohio.  The front door is white with an oval window and there is a storm door installed.  The porch has several white pillars and opens to the front yard.  There are three "dormer" windows above the porch.  There is a covered car port on the right side of the house.

This warrant authorizes the search of not only the building, but the entire property of 203 Cherry Street, Waverly, OH 45690, including curtilage, all outbuildings, trash receptacles, and vehicles located on the premises that are owned or operated by the residents of the property.



**ATTACHMENT B**

<u>PROPERTY TO BE SEIZED</u>

A.  Any and all illegal narcotics, including steroids and cocaine.

B.  Any equipment used in the manufacturing, labeling, storage, and/or distribution of said illegal narcotics, including pre-cursors, drug packaging material, and cutting agents.

C.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers relating to the transportation, ordering, purchasing, processing, storage, and distribution of controlled substances, in particular steroids; all records of assets, liabilities, income and expenses for the years 2017, 2018, 2019, 2020, 2021, 2022, 2023, and 2024.

D.  All travel records to include papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to travel to obtain and distribute narcotics and narcotic proceeds.  Evidence of such travel is often times maintained by narcotics traffickers in the form of airline receipts, bus tickets, automobile rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, logs, travel agency vouchers, notes, cellular telephone tolls, and records of long-distance telephone calls.

E.  All personal financial records including books, records, invoices, receipts, records of real estate transactions, financial statements, bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, canceled checks, credit and debit cards, deposit tickets, passbooks, money drafts, withdraw slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer records, PayPal accounts, Venmo accounts, Cash App accounts and the like, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money.

F.  All personal and business tax records for the years 2017-2024 including all federal, state and local tax returns together with all schedules and attachments; drafts, copies and partially completed returns; tax preparation files including receipts, work papers, and notes; and correspondence to/from or regarding any tax authority, return preparer, or accountant.

G.  Records related to assets or items of significant value (boats, vehicles, real property, jewelry, electronics, precious gems and metals, furs, household/business furnishings, etc.) reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant, including but not limited to records of all assets purchased, obtained, and sold, all liabilities incurred or disposed of, and all expenditures paid either for the subjects, their nominees, or entities.

H.  United States currency, precious metals, jewelry, gold coins, and financial instruments, including, but not limited to, stocks and bonds.

I.   Photographs, including still photos, negatives, video tapes, films, slides, SD Cards and the contents therein, in particular, photographs of co-conspirators, of assets and/or narcotics.

J.   Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, contact numbers, fax numbers, e-mail and social media account numbers of co-conspirators, sources of supply, storage facilities, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

K.   Indicia of occupancy, residency, rental and/or ownership of the premises described above or vehicles located thereon, including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, purchase lease agreements, land contracts, titles, and vehicle registrations.

L.   Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine-guns, and other weapons, and any records or receipts pertaining to firearms and ammunition.

M.   The opening and search, and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained.

N.   Electronic equipment, such as cellular telephones, currency counting machines, telephone answering machines, telephone caller identification boxes, video and audio tapes, and any stored electronic communications contained therein.

O.   All cellular telephones to include their power cords, software, SIM cards, all related documentation, all stored data to include passwords, encryption keys, access codes, SIM passwords, files, programs, money exchange apps, messaging apps, ring tones, pictures, videos, phone books, call history, voice mail, e-mail, text messages, deleted messages audio and/or text and geographical information, and proof of ownership to include correspondence, registration keys or similar items and all cellular related accessories not specifically mentioned herein. To be able to download/retrieve all information from the cellular telephone and put all data into human readable form.

P.   All records relating to violations of 18 U.S.C. §§ 1956, 1957 (conspiracy to commit money laundering, and engaging in monetary transaction in property derived from specified unlawful activity), 21 U.S.C. § 841 (distribution of and possession with the intent to distribute controlled substances, including Schedule III Controlled Substances, Psilocybin Mushrooms, Marijuana, and Cocaine), 21 U.S.C. § 846 (conspiracy to distribute and to possess with the intent to distribute controlled substances, including Schedule III Controlled Substances, Psilocybin Mushrooms, Marijuana, and Cocaine), 21 U.S.C. § 843(a)(5) (unlawful possession of tools used to make a counterfeit substance), 21 U.S.C. § 843(a)(6) (unlawful possession of a tableting machine or product used to manufacture a controlled substance), and 21 U.S.C. § 843(b) (use of communication facility to facilitate the commission of a drug felony) (the "SUBJECT OFFENSES") involving Mark Anglemyer,

██████████, Arin Sodaro, Tanner Morris, Heather Howwell, or Blake Mankin, and occurring after September 1, 2020, including:

    a. Records and information relating to a conspiracy to distribute controlled substances, including steroids and cocaine;

    b. Records and information relating to sources of supply for controlled substances and purchasing controlled substances;

    c. Records and information relating to customers for controlled substances and selling controlled substances;

    d. Records and information relating to sources of supply for materials, equipment and paraphernalia to prepare and package controlled substances for distribution; and

    e. Records and information relating to proceeds from distribution of controlled substances;

Q. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

      h.   evidence of the times the COMPUTER was used;

      i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER, to include phone passwords;

      j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      k.   records of or information about Internet Protocol addresses used by the COMPUTER;

      l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      m. contextual information necessary to understand the evidence described in this attachment.

R.  In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

      a.   Any computer or storage medium capable of being used to commit, further or store evidence of Title 21, United States Code § 841(a)(1) (distribution of a controlled substance); and

      b.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium;

S.  During the execution of the search of the devices identified above, law enforcement personnel are authorized to press the fingers (including thumbs) of Mark Anglemyer, ███████████, Arin Sodaro, Tanner Morris, Heather Howell, or Blake Mankin to the Touch ID sensor of any digital device referred to above found at the search location for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.  Similarly, law enforcement personnel are authorized to position the Face ID sensor of any digital device referred to above found at the search location, in relation to the face of Mark Anglemyer, ███████████, Arin Sodaro, Tanner Morris, Heather Howell, or Blake Mankin, for the purpose of attempting to unlock the device via Face ID to search the contents as authorized by this warrant.

T.  Other fruits and instrumentalities of the crimes of 18 U.S.C. §§ 1956, 1957; 21 USC §§ 841(a)(1), 846, 843(a)(5), 843(a)(6) and 843(b).

      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or

typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.